### THE DELAWARE COUNTY BANK v. DUNCOMBE.

1. **Pleading**: DEMURRER. It is not competent to assail the paragraphs of a pleading by demurrer, the demurrer being proper only when it attacks the legal sufficiency of the whole pleading or a count thereof.

2. **Practice**: OPENING AND CLOSING. Where it is apparent that upon the principal and material issues the defendant has the burden of proof, the action of the court in giving him the opening and close of the case cannot be assigned as error.

3. **Fraudulent Representations**: EVIDENCE: CONTRACT. The defendant, the general manager of a railway company, made a contract with I. for the grading of a part of the road, and I. sub-let some of the work to D., who, having performed a portion of what he had agreed to do, by a fraudulent collusion with the engineer, procured the acceptance of a draft by the defendant for work done under the sub-contract, notwithstanding such work had already been paid for by the contractor: *Held,* in an action upon the draft, that the defendant might be permitted to testify to the particulars of the contract between the contractor and the railway company.

The Delaware County Bank v. Duncombe.

4. ———: ———. Evidence to establish the relation in which defendant stood to the railway company, was not incompetent.

5. ———: ———. Proof of the conversation between the engineer, who procured the acceptance of the draft, and defendant at the time the draft was accepted, was admissible.

6. ———: ———: A civil engineer was properly permitted to testify to admeasurements of the work performed under the sub-contract, notwithstanding such admeasurements were not made until eight months after the draft was drawn.

7. ———: DRAFT: DISHONOR OF. The draft having been sent to a local bank for collection by the plaintiff, which held it as collateral for advances to be made, it was presented to defendant, who said it was a swindle, and who refused to pay it. After that plaintiff made all the advances upon it, upon which its claim of ownership was based: *Held*, that the local bank was the agent of the transmitting bank, and that the latter was, therefore, charged with notice of dishonor, and any defense which would be valid against it in the hands of the sub-contractor was also valid against the plaintiff.

8. ———: PRINCIPAL AND AGENT. It was proper to instruct the jury that, to make available the defense of false representations, the defendant must show, not only that the acceptance was obtained by false representations, but also that such representations were known to the sub-contractor.

*Appeal from Webster Circuit Court.*

FRIDAY, JUNE 7.

THE plaintiff claims of the defendant the amount of a draft which the defendant accepted. The draft is dated November 22, 1873, and, with the indorsements thereon, is as follows:

"John F. Duncombe, General Manager of I. & M. R.:

"Please pay to the order of S. Denton & Co. one thousand five hundred and twenty-seven dollars and forty-one cents, which is in full for grading contract on I. & M. R. up to date.

"INGERSOLL & Co., Contractors,
"per L. C. PHELPS, Engineer."

"Accepted, payable December 20, 1873.
"JOHN F. DUNCOMBE."

"Pay W. H. Seeds, Cashier, or order.

"S. DENTON & Co."

The defendant filed an answer containing nine paragraphs, in substance as follows:

"1. That in June, 1873, defendant made a verbal contract with J. A. Ingersoll, through her agent, D. A. Ingersoll, to grade the Iowa & Minnesota Railway from the east line of Sac county· to Sac City, at three thousand dollars per mile, payable as the work progressed on estimates made, out of taxes voted to aid said road; said Ingersoll to take the entire risk of securing his pay from the tax voted, and to wait for the balance above the tax until it could be earned, and to complete the work during the year 1873.

"2. That S. Denton & Co. agreed to complete four miles of said road according to the specifications in the contract between Ingersoll and said railroad company, and were to receive eleven cents per yard for their work, ten per cent of which was to be retained out of their pay to secure the performance of their contract.

"3. That the said Denton & Co. proceeded with their work until it was nearly completed, the entire contract amounting to about six thousand dollars, and it requiring about the sum of two thousand dollars to complete the same, and that they were fully paid at the time they stopped work, in November, 1873, for all the work then done under their contract with Ingersoll.

"4. That S. Denton & Co. did the cheaper portion of the work, and left the finishing, and one long, deep slough, which would be very expensive to complete, and one station at the crossing of Cedar creek, uncompleted; that while said work was in this condition S. Denton & Co., in order to defraud this defendant, combined with said engineer, and induced him to report to this defendant that said work was completed, and to make a final estimate on said work, which S. Denton & Co. and said engineer knew to be untrue, and to contain over seven

thousand yards of earth more than was done by said S. Denton & Co.; that said S. Denton & Co. applied to the contractor, Ingersoll, to make a settlement with S. Denton & Co., which Ingersoll, on account of the fraudulent estimate, and on account of the work being uncompleted, and on account of the difficult and expensive work being undone, refused to do till the work was completed.

"5. That Ingersoll, in addition to the payments made in full on said work, held a note for one hundred and fifty dollars, which S. Denton & Co. agreed should be applied on the payment for grading under their contract.

"6. That said work has never been completed by S. Denton & Co., or by Ingersoll.

"7. That when said S. Denton & Co. failed to procure Ingersoll to collude with them in defrauding said railroad company, he procured the instrument in suit to be executed by said engineer in the name of said Ingersoll, without any authority or consideration whatsoever, all of which was known to S. Denton & Co.; that said engineer, at the instance and request of said Denton & Co., for the purpose of defrauding said railroad company and defendant, represented to defendant that said work of S. Denton & Co. was completed according to their contract, and had been settled; that the instrument in suit represented the amount due them; that the money was in the county treasury of Sac county to pay the same, and that it was necessary to have the instrument accepted to draw the money from the county treasury; that the defendant, relying upon and induced by the fraudulent statement of the engineer, wrote upon the face of said paper, without reading it or giving it any examination, the acceptance set out in plaintiff's petition.

"8. That on or about the 20th day of December, 1873, the defendant first learned that he had been deceived; that the representations made by said engineer were wholly untrue; that the instrument was fraudulently procured, without consideration; that S. Denton & Co. had been fully paid for all

the work done by them, and .that Ingersoll had refused to make any settlement.

"9. That the plaintiff is not the owner of the claim in suit, and never paid S. Denton & Co. any consideration therefor; that said claim was left by said S. Denton & Co. with the plaintiff for collection, the proceeds when collected to be credited to them in said bank; that plaintiff had full notice of the facts herein stated; that when said defendant refused to pay said claim, it was, over two years since, placed in the hands of an attorney, and since that time has been under the direction and control of S. Denton & Co., and this suit is now brought under their order and direction."

The defendant denies every allegation in the petition not admitted. The plaintiff demurred to each of the paragraphs of this answer, except the last, denominating them counts or divisions. To these various paragraphs the demurrer assigned sixty-nine objections. The court overruled the demurrer, to which the plaintiff excepted. The cause coming on for trial the court gave to the defendant the opening and closing of the case, to which the plaintiff excepted. There was a jury trial, and a verdict and judgment for defendant. The plaintiff appeals, and assigns fifty errors.

*Theodore Hawley*, for appellant.

*John F. Duncombe*, for appellee.

DAY, J.—I. The answer of defendant contains but one count, divided into nine paragraphs. The demurrer does not assail the answer as a whole, but presents objections to the paragraphs, treating them as distinct counts, and is based upon the notion that each should contain a defense to plaintiff's cause of action. It is not competent thus to assail the paragraphs of an answer by demurrer. *Hayden v. Anderson*, 17 Iowa, 158. For this reason the demurrer was properly overruled.

1. PLEADING: demurrer.

The Delaware County Bank v. Duncombe.

II. The action of the court in allowing the defendant the opening and close of the case is assigned as error. While

2. PRACTICE: opening and closing. the answer does not admit, in terms, the allegations of the petition, yet it is apparent that, upon the principal and material issues in the case, the burden of proof is upon the defendant. We cannot say that the action of the court in this regard is so improper or prejudicial to plaintiff as to require a new trial. It has been held that the action of the court in refusing to allow a defendant the opening and closing cannot be assigned as error, nor made the basis of an appeal. *Goodpaster v. Voris*, 8 Iowa, 339.

III. Many errors are assigned upon the rulings respecting the testimony. To dispose of them, even briefly, will occupy

3. FRAUDULENT representations: evidence: contract. much space. The defendant was asked to state the particulars of the contract between the railroad company and J. A. Ingersoll. The plaintiff objected. The objection was overruled. In this there was no error. Denton & Co. were sub-contractors under Ingersoll. It became a very material question upon the trial of the case whether certain unfinished portions of the work, including the long, deep slough referred to, and the station at the crossing of Cedar creek, were embraced in the contract of S. Denton & Co. Upon this question there is a direct conflict of evidence. It certainly has some bearing upon this question to show what was embraced in Ingersoll's contract, and what price she was to receive. From this the jury might determine whether it would be reasonable that Ingersoll would let the cheaper portion of the work at eleven cents per yard, leaving all the difficult parts for another contract, as claimed by S. Denton & Co. This view disposes of several of the objections made to the testimony of the defendant.

IV. Defendant was asked how much he advanced under the Ingersoll contract. The plaintiff's objection to this question was overruled. The defendant answered that he could not tell how much he advanced, but that it was a considerable

amount.    We cannot see wherein the plaintiff could be prejudiced by this answer.

V.    The defendant, having spoken as a witness of the contract of S. Denton & Co. with Ingersoll, said: "I knew nothing of the contract personally, as I was not present when it was made." Plaintiff moved to strike out all that defendant said respecting the Denton contract, for the reason that he states he did not learn the terms of that contract from S. Denton & Co., or from the plaintiff in this suit.    The motion was overruled.    The abstract does not show the existence of the fact assigned as an objection.    Defendant does not say that he did not learn the terms of the contract from S. Denton & Co. He says: "S. Denton & Co. had the contract for four sections of the road, commencing about four miles this side of Sac City, including all the work from that point through the depot grounds, and, perhaps, a hundred or two hundred feet beyond.    I do not remember the exact amount, as I learned from the parties."    The parties are Ingersoll and S. Denton & Co.

VI.    The defendant was asked what officer or agent of the company used any authority to accept or approve of the final completion of the work.    This was objected to as incompetent or immaterial, unless it can be shown that it was disclosed to S. Denton & Co. before they made their contract.    The objection was overruled, and the witness answered, "No one but myself."    This testimony may not be very important, and perhaps there would have been no substantial prejudice in rejecting it; still, in view of the fact that defendant claims he was induced by fraudulent representations to accept the draft, we think it is not improper to show the relation in which he stood to the company and to the contract.    Evidence of such fact supplies a part of the history of the case, valuable, at least, if not necessary to a full comprehension of the case.    We are satisfied that no substantial prejudice could have resulted from the admission of this testimony.

VII.   The defendant was permitted to testify to a conversation he had with Phelps, the engineer in charge of the work, at the time the draft in suit was accepted.   The draft was presented by Phelps to the defendant for acceptance, and the conversation detailed related to the acceptance, and was in substance that it was for S. Denton & Co.'s final estimate ; that the matter was settled, and was all right. The defendant charges a combination between S. Denton & Co. and Phelps, the engineer, to deceive and defraud him, and it cannot be denied that there is evidence tending to support the charge.   Under the issue it was not error to admit proof of what Phelps did about procuring the settlement. This view disposes of the error assigned upon overruling the objection to the testimony of Richards, and the cross-examination of Phelps.

VIII.   It is insisted that the court erred in allowing defendant to testify as to what would be the relative cost of completing the work, to that already done.   It is alleged that the fraud consisted in doing the cheaper portion of the work, and representing that it was all done.   The relative cost of that completed and that undone bore directly upon this issue, and was properly shown.

IX.   The plaintiff moved to suppress twenty-three answers or parts of answers in the deposition of D. A. Ingersoll, which motion was overruled.   Upon this action of the court fifteen distinct assignments of error are based.   No argument is made upon these assignments, except that plaintiff insists that the court erred in overruling his motion to suppress portions of the depositions of D. A. Ingersoll, and asks a careful reading of this portion of the evidence, satisfied this court will have no difficulty in finding error sufficient to demand the reversal of the judgment.   It is no part of the duty of this court to hunt after errors for the reversal of a case.   Unless prejudicial error affirmatively appears, causes should be affirmed.   Assignments of error presented in so general a way should be regarded as unargued, and hence as waived.   This

view also disposes of the assignments of error based upon the overruling of objections to the testimony of W. H. Seeds. We think, however, that it could readily be shown that in these respective rulings there is no substantial error. These views are also applicable to the testimony of the witnesses Colburn and Simmons.

X. One N. B. Everts, a civil engineer, was introduced by defendant and testified as. to measurements which he made in July, 1874, of the work done by Denton & Co. The plaintiff objected that this testimony was incompetent and immaterial, because the measurements were made nearly eight months after the draft was drawn. This fact might affect the value of the evidence, but not its competency and materiality.

XI. W. H. Seeds, cashier of the Delaware County Bank, testified as follows: "The way said bank became possessed of said draft is this: At the time of taking said draft the firm of S. Denton & Co., composed of S. Denton and Alexander Bently, were engaged in the business of buying and shipping grain from Masonville to Chicago, and had been for some time. They did their banking business with said Delaware County Bank. The bank was unwilling to do their business, and advance to said firm money, without collateral security. Hence the draft was turned over to them by said firm, and accepted by said bank for advances to be made to said firm. At about the 31st day of December, 1873, the style of said firm changed to Bently & Co., a company composed of Alexander Bently and Samuel Denton, the same parties composing the firm of S. Denton & Co., to whom said bank continued to advance money upon said draft until the 27th day of May, 1874. Said bank had advanced upon said draft at the 27th day of May, 1874, the sum of eleven hundred and sixty-nine dollars and ninety-two cents, for which the bank had no other security, nor have at this time." There is no other testimony at all in conflict with this evidence. The evidence further shows the following facts :.

The Delaware County Bank v. Duncombe.

The bank became possessed of the draft on the 11th day of December, 1873. The books of the bank show a balance in favor of S. Denton & Co., on the 22d day of December, 1873, of one dollar and nine cents. On the 31st day of December, 1873, an account was opened with Bently & Co. On the 7th day of January, 1874, there was a balance in favor of Bently & Co. of eleven dollars and ninety cents. On the 8th day of January, 1874, the account was overdrawn, for the first time, to the extent of three hundred and seventy-eight dollars and eighty-five cents. On the 5th day of February, 1874, Bently & Co. were indebted to the bank one hundred and seventy-two dollars and eighty-eight cents. On that day they drew upon check five hundred dollars, and continued to draw out until March 29, 1874, when the account stood against them one thousand one hundred and sixty-nine dollars and ninety-two cents. During this time their dealings with the bank amounted to thirteen thousand four hundred and seventy-three dollars and seventy-seven cents. Neither S. Denton & Co. nor Bently & Co. have any credit upon the books of the bank for the draft in suit.

· The articles of incorporation of plaintiff contain the following provision: "If any bill or note belonging to the bank shall not be paid before three o'clock P. M. on the last day of grace, such bill or note shall be forthwith protested, and, while such bill or note remain unpaid, no discount or accommodation shall be granted to any drawer, acceptor or indorser of the same." In the latter part of November, or the first part of December, 1873, the draft in question was sent to the First National Bank of Fort Dodge for collection, with orders not to protest, but to return if not paid. The defendant was notified by the First National Bank that they held the note for collection, and he refused to pay it.

On the 9th day of January, 1874, plaintiff directed the cashier of the First National Bank of Fort Dodge as follows: "Please present the accepted draft to Mr. Duncombe for payment once more, and if not paid within five days please give

the same to Mr. Hawley, attorney at law, for collection, and have it collected as soon as possible." Mr. Hawley received the draft for collection about the 13th day of January, 1874, but suit was not commenced until the 20th day of December, 1875. The draft, as we have seen, was payable on the 20th day of December, 1873. No advancement was made by the plaintiff to Bently & Co., on the faith of this draft, before the 8th day of January, 1874. The draft was then dishonored paper. The First National Bank of Fort Dodge, as agent of plaintiff for the collection of the note, and while engaged in the business of their agency, were informed by Duncombe that he would not pay the draft, and that it was a swindle. The knowledge of the agent thus acquired was the knowledge of the plaintiffs, the principals; so that the plaintiffs made the first advancements upon this draft after it was dishonored, and after they were affected with notice that the acceptor refused to pay it. Not only so, but they made the advancement in violation of the provisions of their articles of incorporation, which provide no discount or accommodation shall be granted any indorser of a bill belonging to the bank, not paid before 3 o'clock P. M. of the last day of grace.

If plaintiffs had bought the draft on the 8th day of January, 1874, they would hold it as dishonored paper, subject to all the equities growing out of the transaction existing between the acceptor and the payee. It cannot be claimed that the undisputed facts of this case place the plaintiffs in any better position. Upon this branch of the case the court instructed the jury as follows: "The draft or acceptance having been assigned or indorsed to the plaintiff as collateral security for money to be advanced to Denton & Co., and the money having been repaid, except the advances which were made after the maturity of the acceptance, I direct you that any defense which has been sustained against it in the hands of Denton & Co. will be equally good against it in the hands of plaintiff." As applied to the established facts of this case, this instruction, we think, is correct. The foregoing view also disposes

of the alleged error in refusing to give the first instruction asked by the plaintiff.

XII. The plaintiff insists that the court erred in refusing to give the third instruction asked, as follows: "If the jury find from the evidence that S. Denton & Co. did work on the railroad in question for Ingersoll & Phelps, or Ingersoll, and that in settlement for said work Ingersoll, or Ingersoll & Phelps, agreed to give them a draft accepted by defendant, and, in carrying out said agreement, Phelps drew the draft in suit, and presented it to the defendant, who accepted it, after which Phelps delivered it, so accepted, to S. Denton & Co., then Phelps, in so drawing said draft, and presenting it to defendant for acceptance, was not an agent for Denton & Co. for that purpose." The court gave the following instruction:

"5. In order to make available the defense of false representations, it will be necessary for the defendant to show, not only that the acceptance was obtained by false representations made by Phelps, but that Denton & Co., or one of them, knew it had been so obtained. In other words, the fact that Phelps obtained the acceptance of the draft, not being the agent of Denton & Co., will not of itself be evidence that Denton & Co. knew of the representations, if any were made; but you may consider the relations of the parties, Denton & Co. and Phelps, with all the evidence tending to show what actual knowledge Denton & Co. had of the manner of procuring the acceptance, and determine the question of their knowledge as shall appear from the preponderance of the evidence."

This instruction is based upon the theory that Phelps was not the agent of Denton & Co., for, if he was their agent, his knowledge and acts would be theirs, and it would not be necessary to prove that they knew that the acceptance was obtained by false representations. In view of the instruction given, there was no error in refusing that asked. For the same reason there was no prejudicial error in refusing to give the fourth instruction asked.

XIII.  The plaintiff assigns as error the refusal of the
court to give the fifth instruction asked, which is as follows:
"The plaintiff having sent the draft in suit to the First National
Bank of Fort Dodge for collection, this did not constitute the
First National Bank of Fort Dodge agents for plaintiff, so
that knowledge of the infirmities in this draft, communicated to
the First National Bank, would be knowledge of the same to
the plaintiff."

This point has been anticipated to some extent.  The First
National Bank of Fort Dodge was the agent of plaintiff for
the collection of the draft.  Whatever knowledge the bank
acquired respecting the draft was obtained from the defendant
when they were actively engaged about the collection of the
draft, and was naturally elicited by such efforts.  The knowl-
edge of the agent, thus obtained, is the knowledge of the
principal.  The principle of the sixth instruction asked is
embraced in and covered by the eighth instruction given.

XIV.  Plaintiff objects to so much of the fifth instruction
given by the court, and set out above, as is contained in the
following language:  "With all the evidence tending to show
what actual knowledge Denton & Co. had."  It is claimed
there is no evidence in the case justifying this language.  It
is true no witness directly testified that Denton & Co. had
knowledge of the circumstances under which the draft was
procured, and yet we feel satisfied that the evidence does tend
to show that Denton & Co. had such knowledge.

XV.  Appellant complains of the giving of the sixth instruc-
tion, as follows:  "If Phelps, in order to procure the accept-
ance, stated to the defendant that Denton & Co.'s contract
had been completed, and that the money was in the treasury
of the county to pay the draft from the tax voted in aid of the
construction, and the defendant believed the same, and did
not know to the contrary, and, relying upon the statements so
made, accepted the draft, and you find that the statements
were untrue, and that Denton & Co. took the draft with
knowledge that its acceptance had been obtained upon such

statements, and that they were untrue, your verdict will be for the defendant." It is claimed that this instruction is so worded as to convey to the mind of the jury that the court intended to charge them, as a matter of fact, that the defendant, in accepting the draft, relied upon the statements made by Phelps. It is apparent, from a reading of the instruction, that this criticism is not well grounded. It is further claimed that there is no proof that the money was not in the county treasury to pay the draft. It is true there is no direct proof of this fact, but it may, we think, be inferred from the fact that S. Denton & Co., as Samuel Denton testifies, would not agree to accept a draft upon Duncombe unless he would accept it personally.

We discover in the whole record no error justifying a reversal of the case.

AFFIRMED.