BESSIE FARNSWORTH, Appellee, v. HAROLD HAZELETT, Appellant.

**ATTORNEY AND CLIENT:** Knowledge of Attorney Imputed to Client.
1   A client is bound by the knowledge acquired by his attorney in nego-
tiating for the collection of a claim, even though the attorney, *because
of his sudden illness,* was unable to communicate such knowledge to
the client. So held in an action in which the knowledge of the attorney
became material on the issue whether an attachment was wrongfully
sued out.

**NEW TRIAL:** Grounds—Numerous-pointed Motion. One who appeals
2   from an order granting a new trial on a numerous-pointed motion
must show that none of the grounds assigned for a new trial were
tenable.

*Appeal from Muscatine District Court.*—A. P. BARKER, Judge.

JUNE 24, 1924.

ACTION at law, aided by attachment, to recover money loaned by the plaintiff. Defendant admitted the debt, but denied it was due, and filed a counterclaim for damages caused by an alleged false, wrongful, and malicious attachment. The jury returned a verdict in favor of the defendant, with a special finding that the attachment issued was maliciously sued out by the plaintiff, and awarded exemplary damages in the sum of $100. Judgment was entered by the court against the plaintiff; but within the time fixed by the court, a motion for new trial and arrest of judgment was filed, which motion was sustained. From this ruling defendant appeals.—*Affirmed.*

*Thompson & Thompson* and *G. Allbee,* for appellant.

*Hanley & Hanley* and *Cook & Balluff,* for appellee.

DE GRAFF, J.—The specific problem in this case, reduced to its simplest terms, is to determine whether the plaintiff is bound by the knowledge which came to her attorney under the circumstances disclosed by the record. In general terms the question is, When and under what circumstances is a principal obligated by the knowledge which is acquired by such agent?

1. ATTORNEY AND CLIENT: knowledge of attorney imputed to client.

The trial court sustained plaintiff's motion for a new trial, on the ground that there was error in admitting certain testimony regarding the knowledge acquired and possessed by plaintiff's attorney, Jesse Fishburn, and in instructing the jury that such knowledge was by law imputed to the plaintiff. Defendant complains of this ruling, and contends that the evidence was properly admitted, and that the instruction correctly states the law applicable to the evidence. The instruction in question reads as follows:

"There is evidence in the case as to steps taken by Mr. Jesse Fishburn, an attorney, in connection with the collection of plaintiff's claim against defendant. If you find from the evidence that Mr. Fishburn was plaintiff's attorney, and attempted to collect this demand from defendant, any information acquired by him in relation to defendant's property, his disposition of it, or intention in regard to it, while he was acting as her attorney, would bind her, whether he communicated it to her or not."

The facts relating to this phase of the case disclose that plaintiff employed Jesse Fishburn as her attorney, to collect a debt admittedly owing her by the defendant, and upon which this action is predicated. His services were engaged sometime in October or November, 1920, and on November 9th he wrote the defendant, requesting that he call at the attorney's office, to settle the claim, and that, upon refusal so to do, suit would be instituted. Upon receipt of this letter, defendant Hazelett went to the office of the attorney, and there discussed the financial situation existing between plaintiff and defendant, with the view of effecting an amicable settlement. Subsequent visits and negotiations for settlement were had until a few days prior to the commencement of this suit. On or about the 20th day of November, 1920, plaintiff's attorney went to the office of the American Savings Bank, and there discussed with its vice presi-

dent, J. L. Giesler, the Farnsworth claim against the defendant, and the matter of obtaining a loan of $1,200 with which to pay the plaintiff. Mr. Giesler had a conversation with the defendant Hazelett, and it was understood that the bank would do what it could to effect a settlement. In a later conversation, in which plaintiff's attorney, the defendant Hazelett, and Giesler took part, it was agreed that the bank would loan defendant the sum of $1,200, which would enable defendant to settle plaintiff's claim. After the consultation, defendant went home and consulted his parents, and thereafter defendant told plaintiff's attorney that he would pay the $1,200, with interest. Shortly after these negotiations between plaintiff's attorney and the defendant, Attorney Fishburn became ill, and was confined to his home. About this time, plaintiff was informed of the disappearance of certain of defendant's property, and that a note which she had indorsed had been transferred by the defendant. It was then that plaintiff attempted to consult with her attorney, and was advised by one of his household that he was ill, and unable to see her or to do anything about the matter. This happened on Saturday, and she forthwith consulted another attorney, and on the following Monday this action, aided by attachment, was instituted by plaintiff.

On this state of facts, the trial court admitted evidence, over plaintiff's objection, as to information acquired by Fishburn in the course of the negotiations conducted by him; and it was upon this evidence that the instruction as quoted is based. It is not claimed that Fishburn actually did communicate to his client any of the facts elicited during the negotiations. The proposition involves the doctrine of imputed notice or knowledge, and it is to this principle we now give attention.

The relation of attorney and client is predicated on the doctrine of agency or representation. A person is legally obligated either (1) because he has consented to be, or (2) because the law, by reason of public policy, thinks it best that he should be. In the employment of an agent and the creation of obligations thereunder, it must be borne in mind that the principal must take account, not only of his own will, but also of the will of the agent; and, within certain limitations, not only his own knowledge, but the knowledge of the agent. Historically speak-

ing, the doctrine of representation or agency is bottomed on the fiction of identity, the unity of principal and agent. The general notion is expressed in the maxim: "*Qui facit per alium facit per se.*" No one questions the legal identity of principal and agent, since equity and good conscience require that one who acts through an agent and avails himself of the benefits of his agent's participation should be charged with his agent's knowledge, as well as his acts. In the last analysis, it is a rule of public policy. As stated by Justice Holmes:

"Every important principle which is developed by litigation is in fact and at bottom the result of more or less definitely understood views of public policy; most generally, to be sure, under our practice and traditions, the unconscious result of instinctive preferences and inarticulate convictions, but none the less traceable to views of public policy * * *" Holmes on The Common Law 35.

The general rule that knowledge of the attorney is chargeable to the client cannot be questioned. This rule is sometimes spoken of as a conclusive presumption of law; but this is a mere matter of terminology. A conclusive presumption is a substantive rule of law; and when the basic facts are before a court, the rule, like any other legal principle, finds application. In the evolution of such a rule, we find that in its origin it was based on presumption, for example: That a child under seven years cannot commit a felony; that a right by prescription presumes a lost grant. Referring to the instant rule, it is said in note, 4 A. L. R. 1593:

"The presumption that the agent has communicated the facts known to him is as conclusive as the presumption that the principal remembers facts brought home to him personally. It cannot be rebutted by showing that the agent did not in fact impart such information; at least, the client is chargeable in the same manner as if personal notice had been communicated to him. In other words, it is one of those anomalies of the law known as a conclusive presumption. More accurately speaking, it is not a presumption at all; it is a rule of law which charges a client with the knowledge possessed by his attorney. This is sometimes called constructive notice; other courts * * * prefer to characterize it as imputed notice."

The viewpoint of Dean Wigmore finds expression in these words: ·

"In strictness, there cannot be such a thing as a 'conclusive presumption.' Wherever from one fact another is conclusively presumed, in the sense that the opponent is absolutely precluded from showing by any evidence that the second fact does not exist, the rule really provides that, where the first fact is shown to exist, the second fact's existence is wholly immaterial for the purpose of the proponent's case; and to provide this is to make a rule of substantive law, and not a rule apportioning the burden of persuading as to certain propositions or varying the duty of coming forward with evidence. The term has no place in the principles of evidence (although the history of a 'conclusive presumption' often includes a genuine presumption as its earlier stage), and should be discarded." 5 Wigmore on Evidence (2d Ed.), Section 2492.

To the same effect it is said:

"It may well be urged that all of these so-called conclusive presumptions may be more properly described as substantive rules of law than as conclusive presumptions of law." 1 Jones on Evidence 23.

The rule is not technical or arbitrary, but is applied when the conditions upon which it is predicated are shown to exist. The so-called exceptions to the general rule call for the consideration of facts and circumstances other and different from what must be established in order to invoke the general rule; but it is not correct to say that the rule or its so-called exceptions are mere rebuttable presumptions. These exceptions are also based upon "more or less definitely understood views of public policy." Fictions and presumptions against the actual facts should be indulged only when some substantial advancement of the ends of justice is to be attained. If the natural or necessary consequence of a rule is productive of injustice, a court should not hesitate to adopt one consonant with right and justice. It is said in *Wallace v. Fletcher*, 30 N. H. 434:

"The common law has been everywhere modified to adapt it to the wants of our community. The English decisions on this subject (prescription) have been but modes of evading the effect of early decisions of their courts, which have been found

inconsistent with the principles of justice. It is clearly as much within the legitimate sphere and customary action of the courts to disregard or to overrule such decisions, as it can be to evade them by nice presumptions, either of fact or of law.''

In *Bradley v. City of Oskaloosa*, 193 Iowa 1072, it is written:

''In the passing of years, the necessity or basis for a rule of civil conduct may disappear; but the rule itself remains. The occasion for the rule may be forgotten; but a new reason is formulated, consistent with the life and public policy of a later period, and the rule lives on. The crowning glory of the common law is its elasticity and its adaptability to new conditions and new state of facts.''

Courts have recognized the unfairness to charge the client with the acquired knowledge of his agent under all circumstances, and therefore have ingrafted the so-called exceptions to the rule governing imputed notice or knowledge. The decisions are not uniform, or the fundamental reasons uniformly consistent, but the exceptions are fairly well defined. Some courts predicate the rule on the duty of the agent to disclose to the principal all of the material facts coming to his knowledge with reference to the subject of his agency, with the supplemental presumption that he has discharged that duty. 21 Ruling Case Law 838. The notice or knowledge, however, has the same effect as to third persons as though the duty had been faithfully performed, since the communication in law is *in præsenti*. The breach of duty on the part of the agent to his principal is no defense, nor may the rule be rebutted by showing that the agent did not in fact disclose his information. The majority rule also affirms that knowledge acquired by an agent before the commencement of the relationship of principal and agent is imputable to the former, if the knowledge is present in the mind of the agent while acting for the principal in a transaction to which the information is material. Ann. Cas. 1912 B, 195. This is the Iowa rule: *McClelland v. Saul*, 113 Iowa 208. This is the Federal rule: *Distilled Spirits*, 11 Wall. (U. S.) 356 (20 L. Ed. 167). This is the English rule: *Dresser v. Norwood*, 17 C. B. (N. S.) 466 (12 Eng. Case Law 704). In the study of the so-called exceptions to the general rule, the

circumstances of the adjudicated cases show (1) that the knowledge came from a privileged source, and is therefore not legally or properly communicable; or (2) that the attorney had a personal interest adverse to his principal; or (3) that the attorney was acting fraudulently; or (4) by reason of the "peculiar facts of the case," as said in *Irvine v. Grady*, 85 Tex. 120 (19 S. W. 1028), knowledge is not imputed: but we do not consider this exception well defined or the reasons therefor well based.

Illustrating these exceptions, we quote the following:

"The client will not be charged with notice of a fraud or wrong to which his attorney was a party while employed by another, and which it is quite certain he would conceal." *Melms v. Pabst Brew. Co.*, 93 Wis. 153 (66 N. W. 518).

"When the knowledge has been acquired confidentially as attorney for a former client in a prior transaction, the reason of the rule ceases, and in such a case an agent would not be expected to do that which would involve the betrayal of professional confidence; and his principal ought not to be bound by his agent's secret and confidential information." *Akers v. Rowan*, 33 S. C. 451 (12 S. E. 165).

"An attorney is not required to disclose to one client the secrets of another entrusted to him professionally by the other client in the transaction of his business. Were the rule otherwise, a man could not safely advise with his attorneys, because he could not foresee * * * what use might be made of the facts communicated to them." *Downer v. Porter*, 116 Ky. 422 (76 S. W. 135).

See, also, *Laird & Keehner v. McCord*, 196 Iowa 972; *Scotch Lbr. Co. v. Sage*, 132 Ala. 598 (32 So. 607).

Predicating the primary rule on the legal identity of principal and agent, the so-called exceptions are not quite logical. If the fiction is preserved, the exception is an antithesis of the reason for the rule.

"But, so long as the fiction which makes the root of a master's liability is left alive, it is as hopeless to reconcile the differences by logic as to square the circle." Holmes on The Common Law 231.

The exceptions, however, like the rule, are grounded on a principle of public policy, and are sound and wholesome. The

exception based on confidential communication simply invokes another rule general in its application, and destroys the efficacy of the agency rule. Carrying a little further the figure of speech based on the fiction of identity, it may be said that the hostility of the agent, evidenced by his personal adverse interests or fraud, destroys, for the time being, the legal identity of principal and agent. The result, therefore, is a mixed question of law and fact. The rule is one of law. Its application depends on the facts of the particular case. There is nothing in the Iowa cases that lends color to a contrary doctrine. *Walker v. Ayres,* 1 Iowa 449; *De Louis v. Meek,* 2 G. Greene 55; *Jones v. Bamford,* 21 Iowa 217; *Allen v. McCalla,* 25 Iowa 464; *Walker v. Schreiber,* 47 Iowa 529; *Delaware County Bank v. Duncombe,* 48 Iowa 488; *Sowler v. Day,* 58 Iowa 252; *Baldwin v. Davis,* 118 Iowa 36; *Cochburn v. Hawkeye Com. Men's Assn.,* 163 Iowa 28.

It remains only to consider whether the case at bar falls within the defined rule. In other words, do the instant facts call for the application of the rule? Admittedly, the plaintiff's attorney did not communicate the facts to the plaintiff; but this, under the theory of the rule, was not necessary. The knowledge in question was not privileged, and it is within the purview of a communication involving the duty of the attorney to communicate.

The ultimate question is: Did the illness and consequent inability of the attorney to confer with his client on the matter in suit relieve the client from the imputation under the rule? A condition arose which made it impossible for the attorney, from the viewpoint of client, to continue in his representative capacity. It was not an abandonment of the agency by the attorney, but an implied termination of services by the client. Had Attorney Fishburn brought the attachment suit, clearly his knowledge of the facts would be imputed to his client. Does a change of attorneys, under the facts presented, make the knowledge acquired by the former attorney in the instant matter not imputable? We think not. No different result would follow had the plaintiff peremptorily dismissed Attorney Fishburn from her service. The evidence was properly admitted, and the in-

struction given by the court in the first instance was a correct statement of the law applicable to the facts.

The order granting a new trial must be affirmed, regardless of the view of the trial court expressed on the question of imputed knowledge in relation to the evidence and the instruction based thereon. The motion for new trial contains six separate and distinct grounds. The trial court passed upon one of the grounds only, and as to the other grounds it was not deemed necessary to express any opinion or make any ruling. This did not even inferentially overrule the other grounds, but it does indicate that they were not considered controlling by the court. Plaintiff could not appeal, as there was no ruling against her; and on appeal of the defendant, this court cannot deny a new trial for the reason that the motion was sustained on an improper or insufficient ground. When a motion for new trial presents several grounds, and is sustained generally, the ruling cannot be disturbed, unless it is shown that the motion could not have been properly sustained on any of the grounds urged. *Van Wagenen v. Parsons,* 106 Iowa 263; *Holland v. Kelly,* 149 Iowa 391; *Woodbury Co. v. Dougherty & Bryant Co.,* 161 Iowa 571. No reversal can be had if any of the remaining grounds of the motion are tenable. *Holman v. Omaha & C. B. R. & B. Co.,* 110 Iowa 485; *Murray v. Chicago, R. I. & P. R. Co.,* 145 Iowa 212. It must affirmatively appear that a new trial should not have been granted on any of the grounds stated in the motion. *Boyd v. Western Union Tel. Co.,* 117 Iowa 338; *McDonald v. Mutual Life Ins. Co.,* 178 Iowa 863.

Appellant has presented and argued but one proposition on this appeal. Under the rule, we will not consider any other. Appellant is bound to show that none of the grounds of the motion for new trial are good. Therefore, the order granting the new trial must be, and is,—*Affirmed.*

ARTHUR, C. J., STEVENS and VERMILION, JJ., concur.

*Margin note:* 2. NEW TRIAL: grounds: numerous-pointed motion.