THE NEW ENGLAND TRUST COMPANY *vs.* ELMER H. BRIGHT & others.

Suffolk.    December 8, 1930. — January 31, 1931.

Present: RUGG, C.J., PIERCE, CARROLL, & FIELD, JJ.

*Agency,* Knowledge of agent constructive notice to principal. *Notice. Stockbroker.*

A bank had a practice of ordering purchases and sales of securities for its depositors to be made through a firm of stockbrokers, the transactions being in the name of the bank and on its credit without disclosure of the depositors' names. An officer of the bank had authority to conduct such transactions for depositors, but not for his own account. No actual notice of that limitation of his authority was given to the stockbrokers. The officer effected transactions with the stockbrokers in substantial amounts continuously from March to October in a certain year, some of them throughout that period being in reality for his own account, although ostensibly in the name and on the credit of the bank. A certain employee of the stockbrokers handled many of the transactions for the officer and knew that some of them were in reality for the officer's own account and were unauthorized by the bank. The employee left the employ of the stockbrokers on August 1. In the preceding March certain purchases of stocks were transferred on the stockbrokers' books from the bank's

account to the officer's personal account with them; and, following uneasiness on the part of the officer, on August 30 another account was opened in the name of the bank, "Spec. Acct.," all transactions thereafter originating with the officer ostensibly for the bank being carried in this account. Although the bank's president knew that the officer was buying and selling securities for customers' accounts, neither the president nor the other responsible officers knew until October that he was conducting transactions with the stockbrokers in the bank's name for his own account. The bank then repudiated certain purchases by the officer for his own account; and the stockbrokers sought to recover from the bank the purchase prices, which they had paid relying in good faith on the credit of the bank. *Held,* that

(1) Although the officer was an agent of the bank, a finding was warranted that the circumstances were not sufficient to put its responsible officers on inquiry as to his doings in connection with the transactions with the stockbrokers in its name but on his own account;

(2) A finding was warranted that the knowledge of the stockbrokers' employee, previous to the termination of his employment, that the officer was exceeding his authority in purchasing stocks for his own account, was to be imputed to the stockbrokers;

(3) Such knowledge imputable to the stockbrokers related to the whole course of the transactions of the officer with them, and, in all the circumstances, continued to put them on inquiry and to bind them even after their employee terminated his employment;

(4) The stockbrokers could not recover.

BILL IN EQUITY, filed in the Superior Court on January 31, 1930, and afterwards amended.

The plaintiff sought to have the defendants, a firm of stockbrokers, ordered to deliver to it certain securities which, it alleged, it had ordered from the defendants for accounts of its customers and of certain trusts of which it was trustee, and for which it had paid in full.

The defendants filed a cross bill in which they alleged that one Morrill, an officer of the trust company, had ordered certain other securities which they had purchased and paid for in reliance upon the responsibility of the trust company and that the trust company had refused to pay to them the purchase price of and commissions on such securities; and sought to recover those sums.

The suit was heard by *Weed,* J. Material facts agreed upon and found by the judge are stated in the opinion. By his order there was entered a final decree dismissing the bill and the cross bill. All parties appealed.

*M. Jenckes,* (*R. Wait* with him,) for the defendants.

*J. M. Morrison,* (*R. N. Daley, Jr.,* with him,) for the plaintiff.

CARROLL, J. This suit in equity was heard by a judge of the Superior Court on the original bill and cross bill. The parties agreed that the securities which the plaintiff sought to have the defendants required to deliver to it had been so delivered since the suit was brought; that securities mentioned in the cross bill had been sold, and that if the defendants are entitled to recover on their cross bill, such recovery should be in the sum of $11,773.69, with interest. Both the original bill and the cross bill were dismissed. The plaintiff and defendants appealed.

The plaintiff is a trust company. The defendants are stockbrokers in Boston. The judge found that on March 1, 1929, the firm of Clement, Parker and Company, stockbrokers, was dissolved. John F. Barry was a member of this firm and on its dissolution he became a member of the defendants' firm. A so called " customers' " man, by the name of Palfrey, a bookkeeper, Poor, and other employees of Clement, Parker and Company entered the service of the defendants. For a time the Clement, Parker and Company office was continued as a branch of the defendants, but on or about June 14, 1929, it was given up and thereafter Barry, Palfrey and the other employees of Clement, Parker and Company were located at the defendants' offices. Palfrey continued with the defendants until August 1, 1929, when he became an employee of another brokerage concern. The plaintiff had in its employ since 1903 one Morrill; he became its assistant treasurer in 1920; in June, 1929, he was appointed assistant vice-president in charge of the credit department.

It was the practice of the plaintiff to receive orders from its customers for the purchase or sale of securities, causing the orders to be executed through some brokerage house, the deposit accounts of the customer being charged with the amount of the purchases or credited with the proceeds of the sales. Morrill, with other employees of the plaintiff, had authority to conduct these transactions.

Palfrey, who was well known to Morrill, handled many such transactions while employed by the defendants as well as in his former employment. It was known to the plaintiff's president that Morrill was buying and selling securities for customers through Palfrey. When such orders were given the purchaser's name was not disclosed to the brokers, except when a transfer of stock was called for. Morrill had no authority to buy securities on the credit of the plaintiff in his own name. No notice was given the defendants of this limitation on Morrill's authority, but it was found that the defendants knew or should have known of this limitation of authority. For years prior to 1929, Morrill traded in stocks for his own account; many of these sales and purchases were made through Clement, Parker and Company and later through the defendants. These transactions of Morrill were made on the plaintiff's credit in the same manner as if made for a customer. Morrill also carried with the defendants a margin account in his own name. He suffered losses in October, 1929, and at this time he confessed to the plaintiff's president what he had been doing. The plaintiff repudiated the purchases made by Morrill in its name but for Morrill's own benefit, as unauthorized; the defendants demanded payment for the securities purchased by Morrill on orders given them by Morrill in the name of the plaintiff, contending they were made in good faith.

All of the securities listed in the memorandum attached to the findings of material facts were purchased by Morrill from the defendants by orders in the plaintiff's name, but in reality for his own benefit. As to the question of the defendants' knowledge that Morrill in buying on the credit of the bank was buying for himself, the evidence was conflicting. It is set out in the findings in detail. It appeared that a transfer of certain items from the plaintiff's account to that of Morrill was made on the books of Clement, Parker and Company by direction of Palfrey after conferring with Morrill, and Palfrey knew that Morrill had purchased these items for his own benefit and not for the plaintiff's customers. This transfer was on

March 1, 1929. This transfer on the books of Clement, Parker and Company was known not only to Palfrey but to Poor and Barry. Because of a questionnaire to be sent out by the New York stock exchange the plaintiff's account on the defendants' ledger was credited F. O. M. with the amount of certain purchases and on the same day Morrill's personal account was debited with the same. This change in the account to F. O. M. was made on March 29, 1929. It also appeared that in July, 1929, "Preparations were in progress to meet another questionnaire." The checking up of the plaintiff's memorandum statement "caused uneasiness on the part of Morrill." He complained to Barry and on August 30 an account was opened on the defendants' books entitled "New England Trust Co. Spec. Acct." To this account from the regular account of the plaintiff were transferred eight items, all of which except three were stocks purchased in the name of the plaintiff but for Morrill's own benefit, and thereafter all transactions originating with Morrill, ostensibly for the plaintiff, were carried to this account. "Confirmation slips, statements of individual transactions, and monthly statements of the special account were sent to the plaintiff, addressed 'New England Trust Co. Spec. Acct.' and, by Morrill's direction to the mailing clerk, reached him unopened and were not seen by other officials of the plaintiff." Between March 1 and late in August "the orders handled by the defendants and charged to the plaintiff's general account were substantial." They averaged about ten a day, and the daily balances varied from a few dollars to many thousand dollars. On July 31, 1929, the plaintiff owed the defendants $35,284.52. On September 13 stock to the amount of $21,430 was purchased ostensibly for the plaintiff but in reality for Morrill. During September and October the transactions on Morrill's orders in the plaintiff's name were about fifteen and at least one half of these were for Morrill; the daily balance of this special account containing the transactions of Morrill "was never less than $30,000, and for the most part considerably exceeded that figure." The securities here in question were carried

by the defendants "for considerable periods of time without requests for deliveries and without settlements and were still so carried on October 29, 1929."

It was found that Palfrey before he was employed by the defendants and while working for Clement, Parker and Company knew that Morrill was from time to time purchasing securities in the plaintiff's name, although in reality for himself. Palfrey knew that these purchases were not authorized. While Palfrey was employed by the defendants he knew that certain items in issue were made by Morrill for himself and it was ruled that Palfrey's knowledge was to be imputed to the defendants and was sufficient to put the defendants upon inquiry as to all subsequent purchases; that, although some of the purchases in issue were made by Morrill without authority after Palfrey ceased to be employed by the defendants, these purchases were so far related to the transactions of which the defendants' agent knew that the constructive knowledge which arose during Palfrey's employment still continued after he had ceased to be employed by the defendants, and that notice to an agent, while acting for his principal, of facts affecting the transaction is constructive notice to the principal. *Brooks* v. *Shaw,* 197 Mass. 376. *Cotter* v. *Nathan & Hurst Co.* 218 Mass. 315. *Merchants National Bank* v. *Marden, Orth & Hastings Co.* 234 Mass. 161, 171.

Morrill was the agent of the plaintiff, but the responsible agents of the plaintiff had no actual knowledge of Morrill's wrong doing until October 28, 1929, and had no knowledge of the transactions here in question; nor were the circumstances attending these transactions sufficient to put such officials upon inquiry. On the other hand, Palfrey had actual knowledge that certain purchases made by Morrill ostensibly as agent for the plaintiff were made for himself. Palfrey knew this before he became the agent of the defendants and he had this knowledge while he continued in their employ. He was the agent of the defendants to conduct the transactions and as to unauthorized purchases made by Morrill during the employ-

ment of Palfrey the defendants were charged with knowledge and were put on inquiry. Palfrey's knowledge of Morrill's conduct while Palfrey was employed by the defendants is to be imputed to them. He was acting within the scope of his authority. He was not engaged in an independent fraud of his own and was not dealing with his principal as an adverse party; his knowledge put the defendants on inquiry; they had constructive knowledge that Morrill was acting contrary to his authority in buying securities for himself on the credit of his principal. *Merchants National Bank* v. *Marden, Orth & Hastings Co., supra,* and cases collected. *Tremont Trust Co.* v. *Noyes,* 246 Mass. 197, 206, and cases cited. *Stevens* v. *Mulcahy,* 261 Mass. 116. *American Agricultural Chemical Co.* v. *Robertson,* 273 Mass. 66, 84–85.

The more difficult question is whether the defendants had constructive knowledge of Morrill's conduct in excess of his authority after Palfrey had left their employment. Decisions are to be found which hold that, once the agency has come to an end, the knowledge of the former agent is no longer imputed to the principal; that, the principal being no longer in receipt of the benefits of the agency, he is no longer to bear the burden of his knowledge. See *Blackburn, Low & Co.* v. *Vigors,* 12 App. Cas. 531; *Murray* v. *Preferred Accident Ins. Co.* 199 Iowa, 1195, 1203. But this rule is not followed under all circumstances and the principal may be bound by the knowledge of the agent after the relation has ceased. The theory of this distinction is that it is to be presumed that the agent communicated his knowledge to the principal. The defendants while Palfrey was their agent knew constructively what Morrill was doing in a continuing series of transactions of large amounts; they knew that he was exceeding his authority, that this was his regular course of business and this same course of business continued after Palfrey was no longer the agent of the defendants. *Birmingham Trust & Savings Co.* v. *Louisiana National Bank,* 99 Ala. 379. See *Bland* v. *Shreveport Belt Railway,* 48 La. Ann. 1057; *Loring* v. *Brodie,* 134 Mass. 453, 462.

The defendants' knowledge remained while Morrill continued to buy stocks. From the course of business, the frequency and extent of the transactions as well as the changes made in the books of account, the defendants were required to investigate and make inquiry in order to determine if the purchases were for Morrill or his principal. This was not a single transaction but many continuing purchases carried on in a manner similar to those carried on when Palfrey was the defendants' agent. Having this constructive knowledge of Morrill's failure to act within his authority, they continued to do business with him without investigation or inquiry, making no attempt to ascertain if his transactions were with the plaintiff's sanction. The knowledge of the defendants' agent was their knowledge and it continued during the time the purchases in issue were made. As persons of ordinary prudence, the defendants were put upon inquiry and this " is constructive notice of everything to which that inquiry might have led." *Shaw* v. *Spencer,* 100 Mass. 382, 390. When Palfrey left the employment of the defendants they were charged with constructive knowledge of Morrill's conduct; they were bound if Morrill continued to trade with them to inquire as to his authority. See *Loring* v. *Brodie,* 134 Mass. 453, 459; *Allen* v. *Puritan Trust Co.* 211 Mass. 409, 421.

The defendants rely on *Blackburn, Low & Co.* v. *Vigors,* 12 App. Cas. 531. We are of opinion, however, that the extended dealings of Morrill and the nature of the business carried on by him with the defendants distinguish the present case from *Blackburn, Low & Co.* v. *Vigors.* The constructive knowledge of the defendants related not only to the particular transactions but to the whole course of dealing. In this respect on the facts shown no distinction is to be made between constructive and actual knowledge. For if the defendants had actual knowledge of Morrill's conduct while Palfrey was in their service, the information, even after Palfrey's services were concluded, would bind them. In view of the nature of the business and the way in which it was carried on, the constructive knowl-

edge also required them to ascertain if Morrill's acts were authorized by his principal although Palfrey was no longer in their employ. See *Farrington* v. *South Boston Railroad,* 150 Mass. 406, 409, 410.

Palfrey was not engaged in a fraud of his own when concealing his information of Morrill's acts; he was working as the defendants' agent and seeking to hold the business furnished by Morrill for his employers. *Innerarity* v. *Merchants' National Bank,* 139 Mass. 332, and similar cases, therefore, are not applicable.

The plaintiff contends that Barry also had knowledge that Morrill was acting beyond his authority. We do not think it necessary to discuss this point further than to say that the judge who heard the evidence found as a fact that Barry did not know of Morrill's misconduct with reference to the items now in issue, notwithstanding his earlier knowledge. This finding, in our opinion, should stand.

The defendants cannot recover from the plaintiff because the securities were in fact purchased by Morrill for himself while acting as agent for the plaintiff and the defendants had constructive knowledge that Morrill exceeded his powers in the transactions. The decree dismissing the plaintiff's bill and the cross bill is affirmed, with costs to the plaintiff.

*Ordered accordingly.*