[Civ. No. 16219.   Second Dist., Div. Three.   Sept. 20, 1948.] ·

COLUMBIA PICTURES CORPORATION (a New York Corporation), Respondent, v. ANDRE DeTOTH, Appellant.

Oliver B. Schwab, Robert E. Ford, Arthur Livingston and Edward Rubin for Appellant.

Mitchell, Silberberg & Knupp and Arthur Groman for Respondent.

VALLÉE, J.—Appeal by defendant from a judgment for plaintiff in an action for declaratory relief. The case was before the Supreme Court on an appeal from a judgment dismissing the action after an order sustaining a demurrer to the complaint without leave to amend. The judgment was reversed. (*Columbia Pictures Corp.* v. *DeToth,* 26 Cal.2d 753 [161 P.2d 217, 162 A.L.R. 747].)

Upon return of the cause to the superior court the complaint was amended. So far as pertinent here, the case went to trial on the amended complaint and defendant's answer thereto. By its amended complaint plaintiff-respondent, a producer of motion picture photoplays, sought a judgment declaring that on June 7, 1943, it and defendant-appellant had entered into an oral agreement whereby respondent employed appellant and appellant entered the employ of respondent as a director of motion picture photoplays for a term of one year immediately next ensuing to render services as such director and as respondent might designate from time to time within said term of one year; that respondent agreed to pay appellant, in consideration of said services, the sum of $250 a week for each week that he should actually render services under the contract; that by the agreement respondent should have the right to loan the services of appellant to others, in which event appellant agreed to render his services to such others to the best of his ability; that by the agreement it was agreed that

respondent should have the right to place appellant on layoff without compensation for specific periods; that respondent was given the option or privilege of renewing or extending the agreement for a term of one additional year at a compensation of $350 a week, a second additional year at a compensation of $500 a week, a third additional year at a compensation of $750 a week, a fourth additional year at a compensation of $1,000 a week, a fifth additional year at a compensation of $1,250 a week, and a sixth additional year at a compensation of $1,500 a week, and that each and all of the options were to be exercised by the plaintiff before the expiration of the original or any ensuing and current yearly term thereof.

Respondent, Columbia Pictures Corporation, referred to as Columbia, is a producer of motion picture photoplays. In 1943, Arnow was an executive of Columbia. Allenberg was a motion picture agent. In early 1943, appellant DeToth was an unknown quantity in the motion picture industry in this country, with no reputation as a director. On February 19, 1943, Columbia employed DeToth to write the script of a picture, ''The Clock Struck Twelve.'' On April 22, 1943, Columbia, by a writing, employed DeToth to direct ''The Clock Struck Twelve.'' DeToth directed the picture, working for four weeks. His compensation was $350 a week. ''The Clock Struck Twelve'' was a class B ''Lone Wolf'' picture, or low budget detective story. About this time DeToth employed one Matone, a motion picture agent, to assist him in obtaining employment as a director. Matone then negotiated with Columbia, seeking a term contract for DeToth. Columbia and other motion picture producers, generally, have two standard forms of contract with directors. A ''one picture contract,'' which is one in which a director is employed to direct one picture, and a ''term contract,'' which is one in which a director is employed for a specific period of time, with or without options in the producer to renew the employment for definite periods in the future. Under a ''term contract'' the producer may require the director to direct any picture or pictures it wishes.

After completion of ''The Clock Struck Twelve'' and on June 2, 1943, DeToth had a conversation with Arnow in which Arnow told him that Columbia was considering making a ''term contract'' with him, with a salary of $250 a week for the first year, and the options alleged in the amended complaint, on the general standard form of contract used by

Columbia for directors. DeToth expressed appreciation to Arnow of the fact that he was going to obtain a "term contract." DeToth denied this conversation. He testified that he was not alone with Arnow when salary or options were discussed, they were discussed only when Allenberg was present and that: "He [Arnow] asked me once if I would want to sign a long-term deal, and which I said I would be more than willing to do so, but no terms were discussed. The detailing of the terms came up only in connection with the contract of long-term." After this conversation with Arnow, DeToth immediately cancelled his agency agreement with Matone, and on June 2, 1943, by a writing, employed Allenberg for a period of five years "to use all reasonable efforts to assist me in negotiating for employment whenever my services are or will be available." He did so because he thought Allenberg could better assist him in obtaining a "term contract" with Columbia. DeToth testified: "Later when the deal became 'hot,' I approached an agent, Bert Allenberg." DeToth told Allenberg at the time he employed him of his conversation with Arnow, that Columbia was "about to give him an important assignment," that they wanted him to sign a "term contract," and that he had some sort of an agreement with a New York lawyer to act as his agent, which expired July 19, 1943. He did not tell Allenberg that he had entered into a long term contract "because that wouldn't have been the truth." Allenberg advised DeToth that if he signed a term contract with Columbia prior to the expiration of the other agent's contract he would be obligated to pay the other agent for the full period of the Columbia term contract and that he (Allenberg) thought he could make a satisfactory arrangement with Columbia whereby DeToth could have the term contract but not actually sign until after the agency contract with the other agent had expired. Allenberg then telephoned Arnow and told him that he was now DeToth's agent. On June 7, 1943, Allenberg and DeToth went to see Arnow. Arnow read to them the terms he had previously stated to DeToth as to salary and options and stated that Columbia insisted that DeToth sign a "term contract." Allenberg then told Arnow about DeToth's contract with the New York agent and asked Arnow if he would take his, Allenberg's, word for it that DeToth would sign the term contract as soon as he was legally free from the prior agent. Arnow said that he would. Allenberg then had Arnow repeat the salaries and options to DeToth and

turned to DeToth and said "Is that correct? Do you agree?" DeToth said "Yes." The three then shook hands and one of them said "This is a deal." After Arnow had stated the terms Allenberg said to DeToth: "I have given my word that you will sign this agreement. The studio is willing to give you another picture without your signing on the strength of my reputation here. So I want to ask you in front of Arnow, 'Do you agree, and will you sign it when you are free of your other agent?'" DeToth said "Yes." At the time DeToth asked Arnow to delay the signing of the contract until after July 19th.

Columbia has standard contracts that it uses for actors and directors. When a contract is prepared the only information its legal department receives is the name of the party with whom the contract is to be made, salary and length of time of the contract. Allenberg was familiar with the Columbia standard form of contract for directors. He understood that that was the type of contract they were discussing. Arnow told DeToth that he was going to make one picture between June 7 and July 20. DeToth then left the meeting. Allenberg remained with Arnow and sought to get him to increase the salary previously agreed upon. Arnow would not increase it. It was then agreed between Allenberg and Arnow that DeToth would immediately commence direction of "Nine Girls," and a written agreement, dated June 7, 1943, was signed by Columbia and DeToth, covering its direction. Allenberg persuaded Arnow to increase DeToth's salary for directing "Nine Girls" from $250 a week to $350 a week, on the argument that DeToth had been paid $350 a week for directing "The Clock Struck Twelve" and his salary should not be reduced. "Nine Girls" was DeToth's first picture under his "term contract." Arnow would not have entered into the one-picture contract for "Nine Girls" in the absence of an understanding on his part that Columbia had a long term contract with DeToth. If it had not had a long term contract it would have insisted on an option in the "Nine Girls" contract. A short time later another picture, "None Shall Escape," was substituted for "Nine Girls" by agreement between Columbia and DeToth. "None Shall Escape" was a AA picture. It cost $520,000. Either on or immediately following July 19, 1943, Arnow called Allenberg to have DeToth sign the term contract. Allenberg told Arnow that they should delay signing until after DeToth had completed "None Shall

Escape.'' Arnow, after consultation with others at Columbia, agreed. At that time Allenberg told Arnow that as soon as DeToth finished ''None Shall Escape'' he would sign the term contract.

On September 20, 1943, a memorandum was sent by an executive assistant at Columbia, whose duty it was to review all contracts, to its legal department to prepare a long term contract with DeToth as a director specifying salary, options and time. A written contract was prepared containing the salaries and options discussed by Arnow, DeToth and Allenberg on June 7, 1943, and the provisions of Columbia's standard term contract for directors and sent to Allenberg. The term contract which was prepared is practically identical with the one-picture contract that DeToth had signed for direction of ''The Clock Struck Twelve'' except for length of time, options, a loan out arrangement, and layoff provisions in the term contract. Allenberg persuaded Columbia to agree to several changes in the written form, all favorable to DeToth. The contract as prepared contained a 15-day notice to the director of the exercise of an option and the right in Columbia to terminate the contract in the event of illness of the director for one consecutive week or two weeks in the aggregate during the term. Upon DeToth's request to Allenberg, and Allenberg's persuasion, Columbia agreed to a 30-day notice to DeToth of the exercise of an option and to a right to terminate in the event of his illness for two consecutive weeks or four weeks in the aggregate during the term. As prepared the contract called for a 32 weeks' term from October 27, 1943, instead of 52 weeks. This was done because if it was made for 52 weeks DeToth would have a salary of $250 a week for 52 weeks from October 26, and a change to a higher compensation would have been delayed that much longer. This was done at the request of DeToth. Allenberg went to Kahane and Cohen, executive vice-president and president, respectively, of Columbia, in an effort to increase the salary specified in the contract. Columbia agreed to a bonus of $100 a week payable if DeToth fully performed the contract and his services were satisfactory to Columbia. The form of contract submitted with the changes made at Allenberg's suggestion contained his understanding of the oral agreement entered into June 7, 1943, in Arnow's office. Allenberg testified that an oral agreement was made June 7, 1943, and that DeToth agreed to the options.

After completion of shooting of ''None Shall Escape'' on October 25, 1943, until December 24, 1943, DeToth worked at

Columbia every day for six or eight hours, with the exception of a two-week period. He made the director's first cut of "None Shall Escape." At the request of Columbia he read about nine scripts for the purpose of finding suitable material for a picture for him to direct. He worked on an Army short at Columbia. During the excepted two-week period he was loaned by Columbia to Selznick, another motion picture producer, to direct a sequence of a picture Selznick was producing. Late in November, 1943, DeToth told Allenberg that he was going to work for Selznick. Allenberg told DeToth that "he could not do that, that he was under contract to Columbia and he had no right to make any deals with anybody; and that if he wanted to do this thing for Selznick he should tell Columbia and let Columbia make a loan-out deal." Allenberg immediately called up Selznick and told him the facts and had DeToth talk to Selznick. DeToth told Selznick that he was not in a position to make the deal, that he was under contract with Columbia, and that if he (Selznick) wanted him, he would have to borrow him from Columbia. Arnow then told DeToth to report to Selznick and he reported. Selznick paid Columbia $1,000, or $500 a week, for DeToth's services. After he finished at Selznick he returned and worked at Columbia. The records of Columbia show DeToth assigned to the shooting of a picture until October 19, 1943; after that date until the end of the week of December 22, 1943, he was carried on the list of directors as "unassigned" to a picture. If a director is on a one-picture contract, Columbia does not carry him on its list of directors or marked "unassigned" after he finishes that picture. It only so carries directors under a term contract.

About December 1, 1943, DeToth talked to Kahane, executive vice-president of Columbia. He told Kahane that he did not like being tied up for seven years. Kahane explained the producer's reasons for requiring options, after which DeToth said he was going into Arnow's office and sign the contract. DeToth talked to Kahane and to Cohen, president of Columbia, on December 24, 1943. He told them that he was not convinced he should sign for seven years; that he did not mind being signed up for a reasonable number of years, but that he shuddered at being tied up for seven years. Cohen said, "[b]ut you agreed to 7 years; you ought to adhere to your agreement." DeToth said, "[a]ll right, I will sign a contract."

DeToth was fully paid to October 26, 1943. Columbia issued checks payable to him for his compensation at $250 a week from October 26, 1943, through February 19, 1944. This action was begun March 2, 1944. About October 26, 1943, Allenberg, with the approval of DeToth, asked Columbia not to pay any salary to DeToth while they were discussing an increase. Allenberg's idea was that if the salary of $250 was paid the Wage Stabilization Board would not consent to an increase. Columbia would have paid DeToth $250 a week if it had not been for Allenberg's request. DeToth testified that he told Arnow and Kahane that he had offers of $1,200 and $1,500 and that if they would only come up to $850 he would stay. DeToth ceased working at Columbia December 20, 1943. He then went to work for Stromberg at $1,000 a week. He did not, at any time, sign the contract. At the time of the trial DeToth was receiving $3,077 a week as a director.

The foregoing recital is made from the evidence by accepting in conflict therewith, by resolving all conflicts in favor of its full force and every inference favorable to the respondent which may be drawn therefrom, by excluding all evidence respondent and indulging in all reasonable inferences in favor of the findings. (*Estate of Bristol*, 23 Cal.2d 221, 223 [143 P.2d 689].) The court found that on June 7, 1943, Columbia and DeToth entered into an oral agreement as set forth in the conversations had between Arnow, DeToth and Allenberg on June 7, 1943, as recited above, with salaries and options as alleged by Columbia, and according to Columbia's standard form of contract for directors; that it was the intention of each party to be bound by the oral agreement from June 7, 1943, forward; that the parties anticipated that the oral agreement would, at some future time, be reduced to writing, but that reduction to writing was not a condition precedent to the existence of the binding oral agreement. A copy of the contract, found to have been entered into, is made a part of the findings. Judgment followed accordingly. DeToth appealed.

■ Appellant first contends that the evidence is insufficient to support the findings. There is no merit in the contention. The evidence recited is amply sufficient to support the findings that the parties entered into the oral agreement at the salaries and with the options specified and according to Columbia's standard form of contract for directors, that they agreed to sign a writing at a future time, and that appellant breached the agreement. It is true, as appellant says, that

there is much other evidence in the record from which the court could have drawn contrary inferences and concluded that no oral agreement was made. We may not concern ourselves with that question. ▊ The cases are legion to the effect that when the respective parties orally agree upon all of the terms and conditions of an agreement with the mutual intention that it shall thereupon become binding, the mere fact that a formal written agreement to the same effect is to be prepared and signed does not alter the binding validity of the oral agreement. (*Johnston* v. *20th Century-Fox Film Corp.,* 82 Cal.App.2d 796, 820 [187 P.2d 474]; *Kreling* v. *Walsh,* 77 Cal.App.2d 821, 834 [176 P.2d 965]; *Gibson* v. *De La Salle Institute,* 66 Cal.App.2d 609, 630 [152 P.2d 774]; *Thompson* v. *Schurman,* 65 Cal.App.2d 432, 440 [150 P.2d 509]; anno. 122 A.L.R. 1217, 165 A.L.R. 756.) ▊ It is, of course, likewise the law that if it is the intention of the parties that before a contract shall exist between them, the terms of the contract are to be reduced to writing and signed by them, a complete or binding contract does not arise until a writing evidencing the terms of the agreement has been executed. (*Dexter* v. *Ankiewicz,* 26 Cal.App.2d 326, 333 [79 P.2d 400]; *Plummer* v. *Ehlers,* 50 Cal.App.2d 352 [122 P.2d 939]; anno. 122 A.L.R. 1217, 165 A.L.R. 756.) The distinction between the two lines of cases is pointed out in *O'Donnell* v. *Lutter,* 68 Cal.App.2d 376, 382 [156 P.2d 958]. ▊ Whether it was the mutual intention of the parties that the oral agreement should be binding *eo instante* is to be determined by the surrounding facts and circumstances of a particular case and is a question of fact for the trial court. (*Thompson* v. *Schurman, supra; Johnston* v. *20th Century-Fox Film Corp., supra;* anno. 122 A.L.R. 1233.) The findings as to the terms and conditions of the oral agreement and that it became effective June 7, 1943, are supported by substantial evidence.

Appellant argues in this connection that he did not know on June 7, 1943, what Arnow meant when he said the contract would be "the standard form contract that we use for young directors," and that he did not know the detailed and elaborate provisions of such contract. Appellant was represented in the making of the contract by Allenberg. Allenberg was hired by appellant for the express purpose of representing him in the matter of his employment by respondent. Allenberg was an experienced motion picture agent. He was familiar with the standard form of director's contract used by Colum-

bia. Appellant left the details to Allenberg. The written form of contract submitted by Columbia was in accord with Allenberg's understanding of the terms agreed upon at the meeting of June 7, 1943, at which time appellant accepted Columbia's offer of the term contract. Civil Code, section 2330, provides: "An agent represents his principal for all purposes within the scope of his actual or ostensible authority, and all the rights and liabilities which would accrue to the agent from transactions within such limit, if they had been entered into on his own account, accrue to the principal." Civil Code, section 2332, provides: "As against a principal, both principal and agent are deemed to have notice of whatever either has notice of, and ought, in good faith and the exercise of ordinary care and diligence, to communicate to the other." ■ A principal is chargeable with and is bound by the knowledge of, or notice to, his agent received while the agent is acting within the scope of his authority and which is with reference to a matter over which his authority extends. (*Vanciel* v. *Kumle,* 26 Cal.2d 732, 734 [160 P.2d 802] ; *Bogart* v. *George K. Porter Co.,* 193 Cal. 197, 209, 210 [223 P. 959, 31 A.L.R. 1045] ; *Wittenbrock* v. *Parker,* 102 Cal. 93, 101 [36 P. 374, 41 Am.St.Rep. 172, 24 L.R.A. 197] ; 2 Am.Jur. § 368, p. 286; 3 C.J.S. § 262, p. 194; anno. 4 A.L.R. 1592; 38 A.L.R. 820.) The fact that the knowledge acquired by the agent was not actually communicated to the principal, as contended by appellant, does not prevent operation of the rule. The knowledge is, in law, imputed to the principal. The agent may have been guilty of a breach of duty to his principal, yet the knowledge has the same effect as to third persons as though his duty had been faithfully performed. The agent acting within the scope of his authority, is, as to the matters existing therein during the course of the agency, the principal himself. (*Wittenbrock* v. *Parker,* 102 Cal. 93, 101, 102 [36 P. 374, 41 Am.St.Rep. 172, 24 L.R.A. 197] ; *Watson* v. *Sutro,* 86 Cal. 500, 516 [24 P. 172, 25 P. 64] ; *New England Trust Co.* v. *Bright,* 274 Mass. 407 [174 N.E. 469, 73 A.L.R. 416, 418] ; *Farnsworth* v. *Hazelett,* 197 Iowa 1367 [199 N.W. 410, 38 A.L.R. 814, 817] ; Rest., Agency, §§ 272, 275; anno. 4 A.L.R. 1592, 38 A.L.R. 821, 76 A.L.R. 90.) ■ An agent's knowledge of the content of a contract is imputed to his principal. (*Blair* v. *Wessinger,* 39 Cal.App. 269, 273 [178 P. 545] ; *Preleski* v. *Farganiasz,* 97 Conn. 345 [116 A. 593, 595] ; *Baruch* v. *Buckley,* 167 App.Div. 113 [151 N.Y.S. 853, 855] ; *Shrader* v. *Porter,* 210 Ky. 429

[276 S.W. 115]; *Harding* v. *Home Inv. & Sav. Co.*, 49 Idaho 64 [286 P. 920, 922, 297 P. 1101]; *Klundt* v. *Sande*, 54 S.D. 421 [223 N.W. 338].) ▮ This rule of law is not a rebuttable presumption. It is not a presumption at all. It is a rule which charges the principal with the knowledge possessed by his agent. (2 Am.Jur. § 369, p. 289; anno. 4 A.L.R. 1592, 38 A.L.R. 821.) ▮ The fact that Allenberg acquired his knowledge of the terms of Columbia's standard form of contract for directors prior to his agency does not affect application of the rule. The principal is charged with knowledge which his agent acquires before the commencement of the relationship when that knowledge can reasonably be said to be present in the mind of the agent while acting for the principal. (*Schiffman* v. *Richfield Oil Co.*, 8 Cal.2d 211, 220 [64 P.2d 1081]; *Bogart* v. *George K. Porter Co.*, *supra*, 193 Cal. 197, 210; *Wittenbrock* v. *Parker, supra*, 102 Cal. 93, 103; *Hanlon* v. *Western Loan & Bldg. Co.*, 46 Cal. App.2d 580, 596 [116 P.2d 465]; *Atkinson* v. *Foote*, 44 Cal. App. 149, 165 [186 P. 831]; *Farnsworth* v. *Hazelett, supra*, 197 Iowa 1367 [199 N.W. 410, 38 A.L.R. 818]; Rest., Agency, § 276; 2 Am.Jur. § 376, p. 294; 3 C.J.S. § 274, p. 206; anno. 4 A.L.R. 1614, 38 A.L.R. 823.) ▮ During the course of, and within the scope of his employment, Allenberg knew and had in mind the terms of the standard form of director's contract used by Columbia. Appellant is chargeable with knowledge of the terms and provisions of the contract.

▮ Appellant's second contention is that Arnow, as Columbia's agent, was not shown to have authority to enter into an oral agreement binding Columbia. The court found that Arnow, an executive of Columbia, was particularly charged with the duty of employing actors and directors of minor stature for Columbia. The evidence is to the effect that appellant was, on June 7, 1943, a director of minor stature; that Arnow was an executive of Columbia; that it was his "job to try and find not only new actors and actresses, but also directors and sort of look after those and try to develop them so that they will become important personalities and be of help to Columbia." This evidence, with the inferences which may reasonably be drawn therefrom is sufficient to support the finding in this respect.

▮ Appellant's third contention is that the trial court erred in concluding that the oral agreement was not subject to the defense of the statute of frauds. Appellant first argues that the oral agreement was made on June 2, 1943, with the

original term to expire June 6, 1944, and, therefore, that it was within the statute of frauds. (Civ. Code, § 1624, subd. 1; Code Civ. Proc., § 1973, subd. 1.) As stated above, the court found that the oral agreement was made on June 7, 1943, and this finding is amply supported by the evidence. The oral agreement, as found by the court, contains the following: "24. In consideration of the execution of this Agreement by the Producer, the Director hereby gives and grants to the Producer the following options: (a) To extend the term of the employment of the Director for an additional period of one (1) year from and after the expiration of the term hereinabove specified upon the same terms and conditions as those herein contained, except that the rate of compensation to be paid the Director for this extended period shall be Three Hundred Fifty Dollars ($350.00) a week for each and every week during said term that the Director actually renders his services hereunder; and except that the Producer shall have the right of placing the Director on layoff, without compensation, for a period or aggregate of periods equal to the period in excess of forty (40) weeks during the term." It contains similar provisions, with the increased salaries agreed to, for five succeeding years. It also contains the following provision: "25. Each of the options provided for in Article 24 may be exercised at any time at least thirty (30) days prior to the expiration of the respective next preceding period of employment. The exercise of any option or options granted herein shall be accomplished only by the service upon the Director by the Producer, or his authorized agent, of a written notice of election to exercise said option." Appellant argues that it was error to declare the entire oral agreement with the six yearly options to be valid under the statute of frauds. He says that: Each option had to be exercised by Columbia no later than thirty days prior to the expiration of the year preceding the 'option year.' When exercised each option gives rise to an unconditional agreement of employment to commence at least thirty days after the exercise of the option and to continue for one year after its commencement. Such an agreement of employment for a period of one year to commence *in futuro* is invalid under the Statute of Frauds."

The point was decided adversely to appellant's contention by the Supreme Court on the prior appeal. (*Columbia Pictures Corp.* v. *DeToth*, 26 Cal.2d 753 [161 P.2d 217, 162 A.L.R. 747].) The court there said (p. 758): "An oral contract of

employment for a period of one year 'immediately next ensuing,' with rendition of service to commence on the day after the agreement is entered into is not within the statute of frauds. In applying that provision of the statute (Civ. Code, § 1624, subd. 1), requiring an agreement to be in writing which by its terms is not to be performed 'within a year from the making thereof,' the words 'from the making thereof' are now uniformly construed to exclude the day upon which the agreement is made; that is, the year is considered to begin with the following day and to end at the close of the anniversary of the day on which the agreement is made (*Nickerson* v. *Harvard College,* 298 Mass. 484 [11 N.E.2d 444; 114 A.L.R. note, p. 416] ; 49 Am.Jur. § 24, p. 385, § 54, p. 411; Rest., Contracts (vol. 1), § 198, comment d). A contingency which may extend the period of employment for more than one year, such as that created by the option provisions here alleged, does not bring a contract within the operation of the statute (*Swift* v. *Swift,* 46 Cal. 266; *Hollywood M. P. Equipment Co.* v. *Furer,* 16 Cal.2d 184 [105 P.2d 299] ; 12 Cal.Jur. § 5, p. 858; 49 Am.Jur. § 25, p. 387; 111 A.L.R., note p. 1105).''

The original complaint which was before the Supreme Court contained the following allegations: ''that further by the terms and provisions of said agreement plaintiff was given and granted the option or privilege of renewing or extending said contract for a term of one additional year at a price or compensation of $350.00 per week, a second additional year at a price or compensation of $500.00 per week, a third additional year at a price or compensation of $750.00 per week, a fourth additional year at a price or compensation of $1,000 per week, a fifth additional year at a price or compensation of $1250.00 per week, and a sixth additional year at a price or compensation of $1500.00 per week, each and all of said options to be exercised by plaintiff before the expiration of the original or any ensuing and current yearly term thereof.'' The allegations of the amended complaint were the same.

Appellant says that the Supreme Court did not pass on the question now presented because the original complaint did not allege, what now appears from the evidence, that each option must be exercised at least 30 days ''prior to the expiration of the respective next preceding period of employment.'' Under the allegations of the original complaint and under the evidence an option had to be exercised before

the beginning of an additional period of one year. The result is the same in either case. Appellant misconceives the effect of the statute of frauds. The oral agreement was for less than one year. Its term began June 8, 1943, one day after its date, and ended June 7, 1944. It was a valid oral agreement not affected by the statute. ▮▮▮ The fact that the agreement contained options exercisable prior to "the expiration of the original or any ensuing and current yearly term thereof" did not affect its validity. The possibility of the exercise of the options was a contingency which might never happen. Neither does the exercise of one or more of the options affect the validity of the oral agreement. This is true even though an option is exercised more than 30 days before a term of one year is to begin, thus becoming a binding obligation on the part of both parties for more than one year. If the agreement *can* be performed within one year it is valid. It is only when it *cannot* be fully performed within one year that it is invalid. The statute says "by its terms is not to be performed within a year." (Civ. Code, § 1624, subd. 1; Code Civ. Proc., § 1973, subd. 1.) In *Swift* v. *Swift*, 46 Cal. 266, cited in *Columbia Pictures Corp.* v. *DeToth, supra*, 26 Cal.2d 753, it is said (p. 268) that the agreement is not within the statute " [w]hen the time for the performance of the contract is made to depend upon some contingency which may or may not happen within one year." The oral agreement, if valid in its inception, is valid throughout. The fact that performance may have extended over a greater period than one year does not bring the agreement within the statute. In *McKeany* v. *Black*, 117 Cal. 587, 592 [49 P. 710], it is said: "If the contract *by its terms* is not to be performed within a year it is void; but if it *may* 'by its terms,' be performed within a year, it is not, even though it may not be performed within that time." The principle is stated in American Jurisprudence as follows: "Similarly, where the period for the duration of the contract in the first instance is within a year, the fact that the time of performance may be enlarged on the happening of some contingency beyond a year does not bring it within the statute, for it is nevertheless a contract which may be performed within a year from the time of its inception." (49 Am. Jur. § 25, p. 387, and cases there cited.) Williston states the rule this way: "An oral contract which is capable of performance within a year is not invalidated by the fact that a later contract between the parties made in furtherance of the first cannot be per-

formed within that time." (2 Williston on Contracts, § 495, p. 1448.) The Restatement says: "The words 'cannot be fully performed' must be taken literally. The fact that performance within a year is highly improbable or not expected by the parties does not bring a contract within the Statute." (1 Rest., Contracts, § 198, com. b.) (To the same effect: *Hollywood M. P. Equipment Co.* v. *Furer*, 16 Cal.2d 184, 187 [105 P.2d 299]; *Raynor* v. *Drew*, 72 Cal. 307, 309 [13 P. 866]; *Osment* v. *McElrath*, 68 Cal. 466, 469 [9 P. 731, 58 Am.Rep. 17]; *Dougherty* v. *Rosenberg*, 62 Cal. 32, 37; *Banta* v. *Rosasco*, 12 Cal.App.2d 420, 423 [55 P.2d 601]; *Kressly* v. *District Bond Co.*, 138 Cal.App. 565 [32 P.2d 1112]; *Dutton D. Co.* v. *United States F. & G. Co.*, 136 Cal.App. 574, 579 [29 P.2d 316]; *Stewart* v. *Smith*, 6 Cal.App. 152, 158 [91 P. 667]; *Hewins, Inc.* v. *Marlboro Cotton Mills*, 242 Mass. 282 [136 N.E. 159, 23 A.L.R. 449, 451]; *Carlin* v. *Bacon*, 322 Mo. 435 [16 S.W.2d 46, 69 A.L.R. 1]; *Woodall* v. *Davis-Creswell Mfg. Co.*, 9 Colo.App. 198 [48 P. 670]; 37 C.J.S. §§ 51, 53, p. 560; anno. 129 A.L.R. 534, 536; 15 L.R.A.N.S. 321, 326; Ann.Cas. 1916E 1137, et seq.; 138 Am.St.Rep. 599, et seq.) The fact that option provisions, which, if exercised, enlarged the time of performance beyond a year, were included in the oral agreement did not invalidate it under the statute of frauds, "for it is nevertheless a contract which may be performed within a year from the time of its inception." (49 Am.Jur. § 25, p. 387.)

Judgment affirmed.

Shinn, P. J., and Wood, J., concurred.

A petition for a rehearing was denied October 19, 1948, and appellant's petition for a hearing by the Supreme Court was denied November 18, 1948.