[Civ. No. 4776. First Appellate District, Division Two.—April 12, 1924.]

## L. E. MILLIKEN, Appellant, v. THE BANK OF ITALY (a Corporation), Respondent.

[1] MONEY HAD AND RECEIVED—FINDINGS—EVIDENCE—INFERENCES—APPEAL.—In this action to recover moneys alleged to have been received by the defendant bank for plaintiff's use, the evidence was sufficient to support the findings of the trial court to the effect that defendant never entered into any contract with plaintiff with reference to the disposition or the sale of certain hemp that had been produced by plaintiff and a third person, that defendant never agreed to be bound by any agreement between said third person and plaintiff, that defendant never received the sum sued for, or any other sum, as agent for plaintiff, nor had it ever received any money belonging to plaintiff in any other capacity, that defendant had never received any money for or to the use of plaintiff, and that defendant never agreed to pay any note or any money to plaintiff, on demand or otherwise; and the appellate court could not say that the trial court drew the wrong inferences from the facts in evidence.

[2] ID.—SUBMISSION OF MODIFIED WRITTEN AGREEMENT—REJECTION OF ORAL AGREEMENT.—Conceding that one of the officers of the defendant bank had orally agreed that certain hemp grown by plaintiff and a third person should be harvested and sold, and the proceeds applied, in a certain manner, when plaintiff completed and presented a draft of a written agreement containing additional terms, which had the effect of taking from the possible claims of defendant, said officer was entitled to treat such written instrument as a rejection of his oral agreement and the suggestion of a new agreement.

[3] ID.—POWER TO DRAW INFERENCES—APPEAL.—The power to draw inferences from the facts in evidence rests with the trial court; and the appellate court has no power to state that of two conflicting inferences the trial court should have adopted one inference rather than another.

(1) 7 C. J., p. 757, sec. 569.    (2) 13 C. J., p. 281, sec. 86.    (3) 4 C. J., p. 843, sec. 2830.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco. James M. Troutt, Judge. Affirmed.

The facts are stated in the opinion of the court.

2. See 6 Cal. Jur. 61; 6 R. C. L. 608.
3. See 10 Cal. Jur. 738, 741.

Preston & Duncan for Appellant.

Louis Ferrari for Respondent.

STURTEVANT, J.—The plaintiff commenced an action against the defendant to recover moneys alleged to have been received by the defendant for the plaintiff's use. The plaintiff pleaded his cause of action in two counts. In the first count he pleaded a breach of an express contract, and in the second count he pleaded the common count for money had and received. The defendant interposed an answer which contained denials of all of the material allegations. A trial was had by the trial court sitting without a jury. [1] Thereafter the court made findings: "That the said defendant Bank of Italy never entered into any contract with said plaintiff with reference to the disposition or the sale of any hemp produced on Woodward Island by the plaintiff and one H. H. Laughlin, or otherwise, and said defendant, Bank of Italy, never agreed to be bound by any agreement between the said H. H. Laughlin and the said plaintiff or otherwise." And the court also made a finding: "That the said defendant has never received the sum of $3,750, or any other sum, as agent for the plaintiff, nor has it ever received any money belonging to plaintiff in any other capacity; that said defendant has never received any money for or to the use of said plaintiff, and that the said defendant never agreed to pay any note or any money to plaintiff, on demand or otherwise."

On this appeal the appellant maintains that each of said findings is not supported by the evidence and that the only evidence in the record is to the contrary. If the appellant's contention in this behalf is not sustained, the judgment must be affirmed.

For some months prior to December, 1920, the plaintiff and H. H. Laughlin had been copartners engaged in the production of hemp. At least during a part of that time Laughlin in a different capacity had also been engaged in the production of vegetables and seeds. Laughlin had been doing business with that branch of the defendant's bank which is located at Stockton. The record shows that his personal indebtedness to the bank had arisen to the sum of $20,000 or more. The business of the partnership was

not prosperous, and in December, 1920, the partnership was indebted to the bank on a promissory note in the sum of $2,500. Shortly prior to the month of December the partners had discussed a dissolution of the partnership. After certain preliminary conversations Laughlin called at the bank and understood that the bank was willing to advance him the money and thereupon he went to the plaintiff and offered the plaintiff $7,500 for his half interest in the business. The plaintiff accepted the offer and when the time came for Laughlin to make the payment the bank informed Laughlin that he had misunderstood the bank officials and that the bank would not advance the $7,500. When thereafter Laughlin failed to make his payment on the purchase of plaintiff's interest in the partnership the plaintiff commenced an action against Laughlin for damages. As to when that action was commenced and as to what further proceedings were had in that action, the record does not disclose.

However, in the latter part of December, 1920, the plaintiff and Laughlin discussed a contract on different terms. The partnership owned a plant for the milling of hemp and it also owned a quantity of hemp which had not been harvested and had not been milled. At the same time Laughlin, in a different capacity, owned a quantity of seeds and onions which were in a warehouse and the warehouse receipts were held by the Bank of Italy as security. Under the terms of the second tentative agreement the partners, as between themselves, had agreed that the plaintiff would accept, under certain conditions, the promissory note of Laughlin in the sum of $7,500 in payment of plaintiff's interest. The two partners discussed their affairs with their attorney, Mr. John Hancock. After the discussion Mr. Hancock went to the bank and called on Mr. Ferroggiaro, the assistant vice-president of the bank. Mr. Hancock testified: "I asked Mr. Ferroggiaro whether or not it would be satisfactory to the Bank of Italy to permit the hemp owned by the partnership to be sold through the Bank of Italy, that is, in the name of the Bank of Italy, or the proceeds thereby to be received by the Bank of Italy, and one-half of those proceeds to be applied to the Laughlin indebtedness to the bank, and any future indebtedness arising from any loan that the bank might make

Mr. Laughlin to harvest or mill that hemp, and the other half to be paid to Mr. Milliken. . . . That Mr. Milliken was willing to sell his interest in the partnership for $7,500 if he was given half of the proceeds of the sale of the hemp. . . . Mr. Ferroggiaro said it would be satisfactory. . . . I also explained to Mr. Ferroggiaro that Mr. Miller was representing Mr. Milliken and threatened to sue Mr. Laughlin on his promise to buy the half interest for $7,500, that in order to avoid any litigation we were attempting to buy Milliken out on this basis, providing he was assured that the sales of hemp would be made through the Bank of Italy and he got one-half of all the proceeds. I want to say that at that conversation Mr. Laughlin, the principal, was there, that he agreed and it was said at that time that the bank would do that. . . . Then I went back to my office and drew the contract and sent it to Mr. Milliken at Fort Bragg.

"Subsequent to that time I spoke to Mr. Ferroggiaro about the matter after I was told that the money had not been deposited to the account of Mr. Milliken. Mr. Ferroggiaro then denied having told me and Mr. Laughlin at the time that he had that agreement with us, that he would so divide the fund. He said we were mistaken about it. . . . I am not sure whether Mr. Milliken was present when that arrangement was made with the bank. I am not sure, my belief is that Mr. Laughlin and I had that agreement with the bank. I do not remember that Mr. Milliken was there, because I sent the papers in a day or two up to Mr. Milliken. But I know he was in Stockton at the time the arrangement was entered into about this new deal where he was taking Laughlin's note. That was discussed in my office, but I do not remember now that Mr. Milliken was in the bank with Mr. Laughlin and me, but I have no memoranda in my file on that at all. He might have been. I do not remember going to the bank with Mr. Milliken alone.

"The first conversation I had with Mr. Ferroggiaro was between the 10th and 15th of December, 1920. I went to the bank and had a conversation with Mr. Ferroggiaro about the refusal of the bank to loan Mr. Laughlin the $7,500. In the conversation we had immediately before the drawing of that agreement, we discussed the former conversation that we had. . . . Then I dropped out of the picture and did not have anything further to do with it until some

time after that when either Mr. Milliken or Mr. Laughlin
informed me, I cannot say which one, that the bank had
not applied the one-half of the money to the Milliken ac-
count and then I discussed it with Mr. Ferroggiaro, but
when that was I could not say. It must have been after
the proceeds had been received. . . . The conversation be-
tween Mr. Ferroggiaro, Mr. Laughlin and me was had in
the course of the discussion between Mr. Milliken and Mr.
Laughlin between December 10th and February 15th. The
transaction between Laughlin and Milliken was in process
of negotiation, about being closed. In that conversation I
stated to Mr. Ferroggiaro the terms upon which Laughlin
and Milliken had agreed. . . . Q. Previous to drawing that
agreement of February, 1921, you had a conversation with
Mr. Ferroggiaro about a lawyer in Stockton named Miller.
Had Mr. Milliken at that time had him as his legal repre-
sentative in the matter? A. I don't know except Mr. Miller
told me that he had instituted suit against Laughlin be-
cause of his failure to pay the $7,500. . . . I could not say
now that I told Mr. Ferroggiaro that the notes which Mr.
Laughlin was going to execute and deliver to Mr. Milliken
would be deposited in the bank so the amount could be in-
dorsed on the back of the note. . . . I told Mr. Ferroggiaro
the agreement that had been arrived at between the parties.
It had not been drawn yet . . . I told him the amount of
the sale, and the fact that Mr. Milliken was going to take
Mr. Laughlin's note, and what he wanted to be sure of was
that the money would come through the Bank of Italy, and
that Mr. Milliken wanted it done that way, and I told him
further that Mr. Milliken was interested, that he would get
one-half of the proceeds. That was the important thing
we discussed. I think I told Mr. Ferroggiaro in that con-
versation everything that was to go in that agreement that
had to do with the Bank of Italy. I would not say that I
told Mr. Ferroggiaro that the written agreement was to
provide 'It is further agreed that the said note for $7,500
will be deposited with the said Bank of Italy so that the
payments made as hereinbefore stipulated may be indorsed
upon the said note by the Bank of Italy when paid at the
time as hereinbefore stated.' I might have and might not.
I know I certainly did not call verbally to the attention of
Mr. Ferroggiaro everything in that contract. My explana-

tion of that is this, I had not yet drawn the agreement, and I intended to send it to Mr. Milliken, expecting that he would return it so I could take it to the Bank of Italy, but he never sent it back to me. . . .

"In that conversation with Mr. Ferroggiaro and Mr. Laughlin my memory is this, that Mr. Laughlin had to have some immediate money, and my memory is that Mr. Laughlin told Mr. Ferroggiaro that he would need before these proceeds came in about $1,500. Now that refreshes my memory. Then I discussed with Mr. Ferroggiaro the demand that Mr. Milliken had made that he wanted all the proceeds, and that could not be done for the reason that the Bank of Italy had to put up about $1,500, to pay for the work and labor, and which I explained to Mr. Milliken in my letter to him, where I told him that the bank would not finance the farming operations unless it received half of all the proceeds of the sale and, second, it was impossible for Mr. Laughlin to continue business unless he was given the cost of production. That was why we could not give Mr. Milliken all the proceeds, but were willing to give him half. The bank was not to be paid for its advances for milling before Milliken or Laughlin received anything. The question came up how much would the sales amount to, Mr. Ferroggiaro wanted to know, and Mr. Laughlin said approximately $8,000. They wanted to know how much was coming to the bank, and it was supposed to be $8,000 and the bank had to put up some money, I think about $1,500 and was willing to take one-half of all the proceeds, thinking that would cover the advances they were making, and the rest of the half was to go on Laughlin's (Milliken's?) account. I do not remember anything being said about the net proceeds. It was discussed in that conversation that there was no money on hand to mill that hemp to put it in shape to be sold and that the Bank of Italy was going to advance that money."

The plaintiff also called as a witness Mr. H. H. Laughlin. Referring to the conversation had with Mr. Ferroggiaro in February, 1921, the witness testified: "All that was said was included by Judge Hancock. That conversation was as given by Judge Hancock: . . . At the time of the conversation between Mr. Ferroggiaro, Judge Hancock and me, Mr. Milliken and I were making propositions back and forth and

nothing definite had been agreed upon." The witness further testified that in harvesting the hemp he borrowed from the bank on promissory notes in addition to the $2,500 above mentioned, further sums aggregating $3,200; that when the hemp was ready for sale he found purchasers and that the purchasers after receiving deliveries paid the moneys directly over to the Bank of Italy. From the stipulation of counsel it appears that the total proceeds so received were $7,005.59.

Testifying in his own behalf, the plaintiff testified that shortly before January 18, 1921, he had a conversation with Mr. Ferroggiaro at the bank. He said: "I have a faint recollection that Mr. Hancock was there; I will not state positively whether he was. . . . I asked Mr. Ferroggiaro if in the sale of the hemp that was to be milled that I would like to have all the gross proceeds of the sale placed to my account, on the offer of Laughlin to pay me $7,500. Mr. Ferroggiaro said it would be impossible to pay all the gross proceeds in my account but they would be willing to place half of them on my account, so I said if that was possible that could be done all right. . . . He said he could only place half of the proceeds of the sale on my account because Mr. Laughlin needed some money to conduct the business, and by taking all of the proceeds he would not have the funds to go on with the milling of the hemp."

The witness testified that he had theretofore done his banking business through Mr. Keyes, who was his personal friend and next door neighbor. He further testified that when he went to the bank in January, 1921, that he spoke to Mr. Keyes and that Mr. Keyes told him that Mr. Ferroggiaro was handling that business and to see him. The contract had not been drafted at the time he talked to Mr. Ferroggiaro and therefore he did not have all of the provisions of the contract in mind; he did not discuss with Mr. Ferroggiaro that part of the contract which reads: "It is further agreed that the warehouse receipts held by the Bank of Italy shall not be delivered to the said Laughlin until said note is paid and the proceeds from the sale of the said products so represented by warehouse receipts shall be applied in the manner set forth in the foregoing agreement." He further testified that the same passage was not in the contract at the time Mr. Hancock had his con-

versation with Mr. Ferroggiaro. "I expected the bank would put up the money to mill the hemp and then give me one-half of the proceeds irrespective of its claim for money advanced. That was expressed in the contract. I was not concerned at all in what it would cost to mill the hemp; the only thing I was concerned in was the agreement with the bank whereby they were to pay half the proceeds on my note, irrespective of how much money the bank might have in the hemp itself."

The plaintiff read in evidence the deposition of James C. Keyes, the assistant cashier of the defendant bank. In his deposition the witness read a letter received from the plaintiff under date of January 18, 1921. That letter was produced from the files of the bank. It is addressed, "*Bank of Italy,* Stockton, California. Gentlemen," and therein this plaintiff enjoins the bank from making certain payments. After that letter was received at the bank, the plaintiff went to Stockton. While there he went to the bank regarding his tentative contract of sale to Laughlin. When he went in he called on Mr. Keyes and upon stating the business in hand Mr. Keyes informed him that Mr. Ferroggiaro had charge of that matter. After the plaintiff left the bank he returned to Fort Bragg. While at Fort Bragg he received from Judge Hancock a formal written agreement. After he had executed it he sent the formal written agreement, together with a letter, addressed, "*Mr. J. C. Keyes, Bank of Italy, Stockton, Calif. Dear Sir.*" In the letter he requested that the agreement be read and then recorded. At the time of the trial Mr. Keyes was unable to produce the letter as it was a personal letter and he did not preserve it. Mr. Preston, who had written the letter for the plaintiff, produced his copy. After Mr. Keyes received the written agreement he said that he did not read it but that he informed Mr. Ferroggiaro that Milliken had sent it to him with a request to have it recorded, and the reply was, "The Bank of Italy is not a party to it, go ahead and record it."

In addition to the writings above mentioned, the record contains a copy of the promissory note dated February 15, 1921, for $7,500, a chattel mortgage of even date to secure the same, and a formal written agreement which on its face purports to be between L. E. Milliken, the party of the

first part, and H. H. Laughlin, the party of the second part; it purports to be an agreement to buy and sell an undivided one-half interest in the partnership; it states the consideration of the sale as being evidenced by the promissory note and secured by a mortgage; it covers six pages of the transcript and among other covenants the following:

1. "It is further agreed, that the proceeds from all sales of products, not including hemp, owned by the party of the second part, now situated in the warehouse and upon which the Bank of Italy owns, or has in its possession, warehouse receipts shall first be applied to the payment of the present indebtedness of the party of the second part, to the said Bank of Italy, on loan against above products, and after the payment of such indebtedness, the remaining proceeds from the sales of said products shall be divided as follows:

2. "One-half thereof to be paid to the party of the first part, and applied by the Bank of Italy upon the promissory note for $7,500.00 hereinbefore referred to, and the remaining one-half thereof to be retained by the party of the second part, for the use in the conduct of the business.

"3. It is further agreed, that the warehouse receipts held by the Bank of Italy, shall not be delivered to the said H. H. Laughlin, until the said note is paid, and the proceeds from the sales of the said products so represented by warehouse receipts shall be applied in the manner as set forth in the foregoing agreement.

4. "It is agreed, that all hemp products on Woodward Island, shall be sold in the name of the Bank of Italy, and the proceeds thereof shall be applied by them on the said $7,500.00 note as follows:

5. "One-half thereof to the Bank of Italy and the remaining thereof to L. E. Milliken, party of the first part.

6. "It is further agreed, that the said note for $7,500.00 will be deposited with the said Bank of Italy, so that the payments made as hereinbefore stipulated, may be indorsed upon the said note by the said Bank of Italy, when paid, at the times as hereinbefore stated." (Numbering ours.)

It will be noted that after the payment of Laughlin's debts secured by warehouse receipts, the foregoing paragraphs numbered by us 1, 2, and 3, had the effect of taking from the possible claims of the defendant and turning over to the plaintiff one-half of all proceeds from sales of

Laughlin's crops, although the defendant then held a note of the partnership for $2,500. There is no claim that the defendant ever agreed to such a covenant. **[2]** Conceding, but not deciding, that Mr. Ferroggiaro, for the defendant, had agreed orally to the rest of the terms of the written agreement of February 15, 1921, when the draft was completed and presented containing the additional terms, Mr. Ferroggiaro was entitled to treat the written instrument as a rejection of his oral agreement and the suggestion of a new agreement. (13 C. J. 281, sec. 86.) Such, apparently, was his view, because, when Mr. Ferroggiaro first saw it, he said the bank was not a party.

As to the other paragraphs there are two separate elements involved which require separate considerations. The plaintiff's theory was that the defendant was to advance the moneys for harvesting, but, before repaying itself, that it was to turn over to the plaintiff one-half of the gross proceeds from the sale of hemp. Such a contract would vary from the ordinary experiences of men. It would not be fair to the defendant. The evidence thereon was oral. Oral admissions are to be received with caution. Every presumption is in favor of the judgment of the trial court. **[3]** The power to draw inferences from the facts rested with the trial court. This court has no power to state that of two conflicting inferences the trial court should have adopted one inference rather than another. We may not hold, under these circumstances, that the trial court erred because it held, in effect, that plaintiff's witnesses had misunderstood Mr. Ferroggiaro.

The other branch requiring a separate consideration is that the defendant agreed to set aside one-half of the proceeds and indorse on Laughlin's note payments accordingly. The evidence does not show, and no person who was present at the oral negotiations testified, that Laughlin's note was ever to be in the defendant's possession (and it never was), or that it would ever be presented to the defendant, or that the defendant would make any indorsement thereon. Moreover, the evidence shows that when the parties were endeavoring to make a tripartite agreement, that from the beginning it was contemplated that the agreement between Laughlin and Milliken was to be in writing. No evidence was introduced showing any excuse for not making the

defendant directly a party or, at least, having it indorse its acceptance. Mr. Ferroggiaro was the officer of the defendant who had charge of the business and there is no evidence that either Laughlin or Milliken, or their agent, ever caused the written agreement, which it is claimed he was to carry into execution, to be exhibited to him, or that he was ever advised of the terms which had been actually inserted therein.

There is yet another reason why the plaintiff cannot recover in this case. As pointed out above, the plaintiff held a mortgage on the property theretofore owned by the partnership. After the hemp above mentioned had been sold and the proceeds applied upon the notes held by the bank, the plaintiff returned to Laughlin the promissory note executed by him and accepted a bill of sale conveying Laughlin's interest in the hemp-mill. The bill of sale was dated the ninth day of December, 1921. When the plaintiff surrendered to Laughlin the promissory note, he entered into agreement not to take a deficiency judgment against Laughlin in the proceedings to be had looking toward the foreclosure of the mortgage. All of these things had been done, had and taken before this action was commenced on the fifth day of July, 1922. Now it is the constant theory of the plaintiff that the liability of the Bank of Italy rests in the oral agreement of Mr. Ferroggiaro to carry out the written agreement made between Laughlin and Milliken. However, the facts just adverted to show a decided modification of that agreement.

From the facts above stated several inferences may logically be drawn. It may reasonably be inferred that the value of Laughlin's interest in the hemp-mill was a considerable sum or else that the plaintiff would not have exchanged for it a note of the face value of $7,500. On the other hand, it may be inferred that the value of said interest was not of the full sum of $7,500 or otherwise there would not have been any necessity for a covenant regarding the waiving of the right to take a deficiency judgment. No evidence was introduced from which the trial court could determine the value of the mill, the amount of Laughlin's credit for conveying his one-half interest therein, or what amount, if any, was due by Laughlin to Milliken on the agreement after the bill of sale had been made. The utmost that could be claimed against the Bank of Italy was that

the bank should pay on the unpaid balance of the note a sum not exceeding one-half the proceeds of the sale of the hemp, but, until the unpaid balance was ascertained, it could not be known what sum the bank was liable for. It is clear that if the note had been fully paid the defendant would have no right, with notice of such payment, to pay, for Laughlin's account, any additional moneys to the plaintiff. Although the plaintiff surrendered the note for $7,500 to the maker, he claims he did not, by the surrender, intend to release the whole of his claim against the defendant. By its judgment the trial court found otherwise. We may not hold that the trial court drew the wrong inferences from the foregoing facts. (*Rideout* v. *City of Los Angeles,* 185 Cal. 426, 434 [197 Pac. 74].)

The judgment is affirmed.

Langdon, P. J., and Nourse, J., concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on June 9, 1924.

All the Justices concurred.