[Civ. No. 22170. Second Dist., Div. Three. Nov. 8, 1957.]

AMERICAN AERONAUTICS CORPORATION (a Corporation), Appellant, v. GRAND CENTRAL AIRCRAFT COMPANY (a Corporation), Respondent.

GRAND CENTRAL AIRCRAFT COMPANY (a Corporation), Respondent, v. AMERICAN AERONAUTICS CORPORATION (a Corporation), Appellant.

70

N. E. Youngblood for Appellant.

Latham & Watkins, Ira M. Price II, and John S. Welch for Respondent.

VALLÉE, J.—Appeal from a judgment rendered in two consolidated actions. There was one set of findings and one judgment applicable to the two actions. American Aeronautics Corporation is plaintiff and cross-defendant in action 634602 and defendant and cross-complainant in action 637534. Grand Central Aircraft Company is defendant and cross-complainant in action 634602 and plaintiff and cross--defendant in action 637534. The judgment was adverse to American in both actions and it appeals.

## Action 634602

The complaint is in two counts: the first seeks recovery of an F-51D type aircraft; the second is for damages for detention of the aircraft. Grand Central answered, alleging a possessory right to the aircraft based on a lien for labor performed and materials furnished under the terms of an oral agreement with American embodied in a written contract. Grand Central cross-complained, alleging an oral agreement with American for reconstruction and assembly of two F-51D aircraft on a time and material basis; that the agreement was later reduced to writing; and that delayed completion of work on one of the aircraft and prevention of completion of work on the other was due to failure of American to deliver necessary parts and notice from American to cease work. Grand Central prayed for a declaration of its right to possession of

both aircraft, pending payment for labor performed and materials furnished, and also for damages. American answered the cross-complaint, admitted the making of an oral agreement, alleging it was for the reconstruction and assembly of two aircraft at an estimated contract price with an agreed maximum and a fixed delivery date, and that it refused to execute the written contract on the ground it did not conform to the oral agreement.

About July 12, 1954, Major Cerruto, representing the Republic of Bolivia, contacted Strube, president of American, with respect to the purchase by Bolivia of one F-51D fighter plane and one F-51D dual trainer. About a week later Cerruto and Strube agreed on prices. On July 26 Strube contacted Keithley, manager of operations of Grand Central, and told him American wanted Grand Central to build the planes by overhauling miscellaneous components and materials in the possession of American, and that he wanted a firm price on the job. Keithley told Strube he would take it up with Grand Central's management and contact him.

On July 27 Keithley met with Strube and Cunha of American. Keithley made a tour of American's shop and inspected parts to be used in construction of the planes. The engines were not there. Keithley told Strube he would not give him any fixed or ceiling price on the job; and that Grand Central would take the job on a time and material basis at $4.15 an hour for labor, and at cost plus 10 per cent for materials furnished by Grand Central. Strube stated the engines he had were new and would require only a top overhaul. Keithley told Strube that about 35 working days would be required to construct the fighter. There was no talk about a delivery schedule on the trainer.

On July 28 Keithley met with officials of American and checked various parts proposed to be used in construction of the planes. On July 29 Keithley wrote American "that on the basis of our investigation of July 28, 1954 we have found you to be in possession of the components and assemblies which will allow the complete build-up of two (2) F-51D type aircraft."

On July 29 Strube, Frankel, and Cunha of American met with Johnson, general manager of Grand Central, Keithley, and Carpenter, secretary-treasurer of Grand Central. Strube said he was going to put the job in Grand Central's hands. Johnson said Grand Central would take the job on a time and material basis at $4.15 an hour for labor, and it would

furnish materials at cost plus 10 per cent. Strube said that was satisfactory. Keithley said Grand Central would be able to construct the fighter in 35 working days provided it was given the materials and the trainer would be delivered on receipt of the parts and a conversion kit as soon as possible after completion of the fighter.

Frankel and Carpenter left the July 29 meeting and went to Carpenter's office "to arrange a contract." Carpenter told Frankel Grand Central's regular contracts were time and material contracts and the rate would be $4.15 an hour with premium time for overtime, and materials furnished would be at cost plus 10 per cent, and Grand Central would require a deposit before starting work. Frankel said that would be satisfactory, and a deposit of $4,000 was agreed to. Carpenter told Frankel he would give him a memorandum and prepare a contract.

On July 30 Carpenter wrote Strube the $4,000 deposit would be made on delivery of the parts; further payments of $4,000 would be made each week starting August 9, 1954, until completion of the work; and "As soon as the specifications have been received by our Mr. Keithley, a contract will be prepared and the above schedule of payments incorporated therein. It is understood that the job is for time and material. The direct labor rate for straight time will be $4.15 per hour and an additional premium for overtime and double time will be charged. This will be detailed in the contract to perform the work." Strube did not reply.

American delivered parts to Grand Central on July 31. Grand Central began the work on August 2, 1954. Somewhere between "7 to 14" days later Carpenter prepared a typewritten draft of a contract and submitted it to Frankel who took it with him. Somewhere "around the 20th or 25th" of August, "closer to the 25th," Frankel took the draft to Carpenter and requested changes. Carpenter said he would make the changes and submit the contract to Frankel. Carpenter testified Frankel said "with the changes, why, they would approve it, sign it." Carpenter then drew a formal, typewritten contract making the changes, signed copies of it on behalf of Grand Central, and about August 30 advised Frankel it was ready. Several days later Cunha picked it up. In a few days Carpenter called Frankel and asked that the proposed contract be returned, signed. Frankel said Strube was out of town and as soon as he got back "we would get the contract signed." Around September 10,

15, 20, or 22 Carpenter again asked Frankel to have the proposed contract signed and sent over. Carpenter testified Frankel said it would be signed and sent over. Frankel testified he told Carpenter American would not sign it because it "still did not comply with the original understanding that we had in our meeting with he and Mr. Johnson on the 30th of July. Q. What did he say? A. He said that it was necessary for them to have a signed contract and that I should overlook any difference that we might have at this time in view of the fact that the work was so far in progress, and sign this draft of the contract. Q. What did you say? A. I said that I could not sign this draft of the contract." Carpenter testified: "Q. Did Mr. Frankel ever tell you that he wouldn't sign Plaintiffs' Exhibit No. 9 [the proposed contract] or any copy thereof? A. Not that I recall. Q. Would you say he did not tell you? . . . THE WITNESS: I don't recall that he stated he would never sign it. . . . Q. What did Mr. Frankel say to you and you to him about the execution of this contract at that time? A. I asked him to execute the contract. Q. What did he say? A. He said that he would. Q. He said that he would? A. Yes. Q. Is that the way he stated it? A. He said that substantially. He didn't say that he wouldn't. Q. Wait a minute. Which did he say? Did he say, 'I will sign it,' or did he say, 'I will not sign it'? A. He said he would have the contract signed." This was the last conversation Carpenter had with Frankel regarding the proposed written contract.

The proposed written contract was never signed by American or by anyone on behalf of American. Both the draft and the proposed contract contained a provision that in the event it became necessary for Grand Central by action to enforce the collection of any sum "under this contract, AERONAUTICS" would pay all necessary expenses including court costs and reasonable attorneys' fees that Grand Central might incur in the event it was awarded judgment.

Grand Central continued to perform the work. On intermittent dates, beginning August 2, 1954, to and including September 18, 1954, all the work performed by Grand Central was authorized by a representative of American on a Grand Central form. On each authorization, except those for overtime and for a few pieces of equipment, there was the notation, "T & M Labor $4.15 per hour Material at cost plus 10%." There were 11 authorizations for overtime work; one of them read: "(Subject to final settlement with Mr.

P. A. Johnson) (per previous conversation between Mr. Frankel and Mr. P. A. Johnson)''; three of them read, "Signed under protest." The authorizations were prepared by a representative of Grand Central.

There were frequent shortages of parts and delay in delivery of parts by American. These were reported to it. Some needed parts which American had agreed to furnish were never furnished but had to be fabricated or otherwise supplied by Grand Central. Strube was told that unless various items were furnished the work would be delayed. American did not deliver the blueprints for the trainer to Grand Central until August 17, 1954. "Conversion kit" parts, which American was to obtain from the Air Force and furnish to Grand Central, were never delivered. Strube testified a substantial portion of them was not obtained from the Air Force until the latter part of October 1954, after suit was filed. Many of the parts furnished by American were not serviceable. The engines were damaged. American in writing authorized the repair and replacement of damaged and missing parts and additional work and parts. Numerous parts required more work than that involved in a "normal overhaul."

The fighter was completed on September 23, 1954. On September 29, 1954, American ordered Grand Central to stop all further work and demanded possession of the fighter. Grand Central refused until the amount it claimed due it was paid, and said it would release it on payment of $32,108.95. American then filed action 634602 and secured possession of the fighter on posting a claim and delivery bond. American delivered it to Bolivia on October 17, 1954, in Texas. On the flight to Bolivia it crashed and was destroyed.

The court found: on July 29, 1954, the parties orally agreed Grand Central would perform the work on a time and material basis, with direct labor hours to be paid for at the rate of $4.15 per hour and materials furnished by Grand Central at cost plus 10 per cent, premium rates to be charged for overtime hours, work on the fighter to be completed within a reasonable time of about 35 days, and on the trainer as soon thereafter as possible.

The court further found: "After the commencement of performance of said work by defendant and before the major portion of said work had been performed, plaintiff and defendant set forth the complete terms of their agreement pertaining to said F-51 aircraft in a document entitled 'Time

and Material Contract', a copy of which is attached hereto as Exhibit 'A' and by this reference incorporated herein as though fully set forth at this place. Each of said parties accepted and approved said document as containing the express oral agreement of the parties and each of said parties agreed that it was bound thereby. Said parties did not make execution of said document a condition of becoming bound by said express oral agreement. Defendant executed said Time and Material Contract and delivered it to plaintiff. Plaintiff received and held said document and acted thereon and received the benefits of defendant's performance thereunder as hereinafter found. From time to time thereafter and during the performance of said work and the furnishing of said materials by said defendant, plaintiff stated to and assured defendant that said Time and Material Contract correctly set forth the agreement of the parties and that plaintiff would execute it and deliver it to defendant, but plaintiff did not execute or deliver said document to defendant.''

The court also found: ''In addition to said express oral agreement, each of the various phases of work of reconstructing, modifying and repairing said aircraft was authorized in writing by plaintiff. As in said agreement, each of said written authorizations specified that the work was to be performed on a time and material basis with labor at $4.15 per hour and materials at cost plus 10%''; as to the fighter, Grand Central performed all the conditions and obligations of the oral agreement and the written authorizations; the value of the fighter on October 12, 1954, was $38,-500; as to the trainer, Grand Central fully performed all the conditions and obligations of its agreement to the full extent of its ability to do so and would have completed it as agreed but for the fact that it was prevented from doing so by American demanding that it cease further work; Grand Central has possession of the partially completed trainer; during performance of the agreement American paid Grand Central $24,000; there became due Grand Central the sum of $56,108.95, ''which constitutes the agreed value of the hours of labor performed thereon at the rate of $4.15 per hour for straight time hours, $5.75 for overtime hours at time and one-half, and $6.80 for overtime hours at double time, and for materials calculated at defendant's list price less applicable discounts plus 10% handling charge, of which $29,394.31 is applicable to labor and materials furnished

to said fighter aircraft, $22,354.84 is applicable to labor and materials furnished to said dual trainer aircraft, and $4,359.80 is applicable to labor and materials furnished to said spare parts. The balance of $32,108.95 ($56,108.95 less $24,000.00) was duly demanded by defendant from plaintiff on or about October 1, 1954, and is now due, owing and unpaid.''

The court found it became necessary for Grand Central to seek to enforce collection of the amounts due it; that in action 634602 it did so and incurred expenses for attorneys' fees which were performed; the reasonable value of the attorneys' services is not less than $7,500.

It was concluded that American and Grand Central are parties to a valid and binding express, oral agreement, the terms of which are contained in the document prepared by Carpenter; American breached its agreement; Grand Central is entitled to the return of the fighter ''and since the return thereof is impossible, is entitled to the return of the value thereof, to wit: $38,500, to be held as security for the payment of the sum of $32,108.95, together with interest thereon from the 1st day of October, 1954 at the rate of 7 per cent per annum until paid''; Grand Central is entitled to retain possession of the trainer and spare parts in its possession until the $32,108.95 with interest is paid.

Judgment was that Grand Central recover from American $38,500, the value of the fighter, in lieu of its possession, with the right to retain the $38,500 together with the trainer and certain supporting spare parts until it receives payment of $32,108.95 with interest, which right is a lien; Grand Central have judgment against American for $32,108.95 with interest, for $600 paid by Grand Central as a premium on an insurance policy, and for $7,500 attorneys' fees. As noted, American appeals.

The first point urged is that the judgment is based on a finding of fact and conclusion of law to the effect that American was a party to a valid and binding oral agreement, the terms of which were set forth in an unexecuted written contract, and that such judgment is erroneous as a matter of law. The attack is on the finding that after work began the parties set forth the complete terms of their agreement in the proposed written contract prepared by Carpenter which was signed by Grand Central but never signed by American.

The court first found that on July 29, 1954, the parties agreed that Grand Central would perform the work at $4.15 an hour and furnish materials at cost plus 10 per cent, and

that premium rates would be charged for overtime. It next made the finding attacked. American says these findings are ambiguous. We think not. What the court found was that the parties entered into an oral agreement, that the complete terms of the oral agreement are to be found in the proposed written contract prepared by Carpenter, and that the parties are bound by the oral agreement. The court did not find that the proposed written contract prepared by Carpenter constituted a valid and binding contract. The parties were not bound by both an oral agreement and a written contract; they were bound by an oral agreement. The court specifically found the "parties did not make execution of said document [the proposed written contract] a condition of becoming bound by said express oral agreement."

American contends the finding we have quoted, which states that the parties "set forth the complete terms of their [oral] agreement" in the proposed contract prepared by Carpenter, is not supported by the evidence. This contention must be sustained. The oral agreement, as found by the court, was made on July 29, 1954. It was that Grand Central would reconstruct the fighter and trainer on a time and material basis at the rate for labor of $4.15 an hour and for materials furnished by Grand Central at cost plus 10 per cent, and that premium rates would be charged for overtime. This finding is amply supported. The proposed contract says Grand Central shall do the work and American shall pay Grand Central $4.15 an hour for straight time, $5.75 an hour for time and a half, and $6.80 an hour for double time. It says that materials furnished by Grand Central shall be paid for at cost plus 10 per cent. This portion of the proposed contract was the oral agreement. However, the oral agreement and the proposed contract are not identical. There are numerous other matters in the proposed contract which were not discussed in the conversations of July 29, 1954, which constitute the oral agreement. Most of them are of no consequence and need not be discussed.

One provision in the proposed contract which American vigorously attacks and on the basis of which the court made an award of attorneys' fees to Grand Central provides that if it should become necessary for Grand Central by action to enforce the collection of any sum due it, American should pay all necessary expenses including reasonable attorneys' fees. Payment of attorneys' fees in the event of suit was not a part of the oral agreement. The finding that this provision was a

part of the oral agreement is wholly unsupported. There is no evidence that American ever at any time agreed to this or any other provision of the proposed contract.

The evidence does not support the finding that each of the parties accepted and approved the proposed written contract as containing the oral agreement, or the finding that each agreed it was bound thereby. There is no evidence to support the finding that American acted on the proposed contract and received the benefits of Grand Central's performance thereunder, or the finding that American stated to and assured Grand Central that it correctly set forth the agreement of the parties. The most the evidence shows is that American acted on the oral agreement and received the benefits of Grand Central's performance thereunder and that American told Grand Central the document would be signed and sent over. It was never signed or sent over. The proposed contract was nothing more than a proposal to contract according to its terms in lieu of the oral agreement. Failure to sign under the facts of this case is not the equivalent of assent to the terms of the proposed written contract.

One of the essential elements of a contract is the consent of the parties. (Civ. Code, § 1550.) This consent must be mutual. (Civ. Code, § 1565.) "Consent is not mutual, unless the parties all agree upon the same thing in the same sense." (Civ. Code, § 1580.) It is only on evidence of such consent that the law enforces the terms of a contract or gives a remedy for the breach of it. One cannot be made to stand on a contract to which he has never consented. (12 Cal.Jur.2d 201, § 13.)

An acceptance must be absolute and unqualified. (Civ. Code, § 1585.) ■ An acceptance, to result in the formation of a binding contract, must meet exactly, precisely, and unequivocally the terms proposed in the offer. (*Caldwell* v. *Dalaray Mines, Inc.*, 68 Cal.App.2d 180, 184 [156 P.2d 52] ; *Howard* v. *Chow*, 27 Cal.App.2d 755, 757 [81 P.2d 994].) ■ An offer must be accepted according to its tenor before a binding contract is formed. (*Patterson* v. *Clifford F. Reid, Inc.*, 132 Cal.App. 454, 456 [23 P.2d 35].) ■ The Restatement says: "If an offer prescribes the place, time or manner of acceptance its terms in this respect must be complied with in order to create a contract." (Rest., Contracts, § 61.) [4] Mere statements of intention, or promissory expressions, will not suffice to constitute an acceptance. (17 C.J.S. 387, § 46.)

■ Where a person offers to do a definite thing and another introduces a new term into the acceptance, his answer is a mere expression of willingness to treat or it is a counterproposal, and in neither case is there a contract; if it is a new proposal and it is not accepted it amounts to nothing. (*Milliken* v. *Bank of Italy*, 66 Cal.App. 507, 516 [226 P. 640]; *Ajax Holding Co.* v. *Heinsbergen*, 64 Cal.App.2d 665, 669-70 [149 P.2d 189]; *Lawrence Block Co.* v. *Palston*, 123 Cal.App.2d 300, 310 [266 P.2d 856]; 17 C.J.S. 381, § 43.) In other words, when the proposed contract prepared by Carpenter was presented to American containing the additional terms, American was entitled to treat it as the suggestion of a new agreement.

■ It is the rule that where the oral agreement contemplated the execution of a formal written contract by signing, either party has the right to insist on the condition, and mere acts on the part of one who has not signed will not validate the contract. (*Kessinger* v. *Organic Fertilizers, Inc.*, 151 Cal. App.2d 741, 749 [312 P.2d 345]; *Linnard* v. *Sonnenschein*, 94 Cal.App. 729, 733-4 [272 P. 315]; *Little* v. *Union Oil Co.*, 73 Cal.App. 612, 618-19 [238 P. 1066]; *Emirzian* v. *Asato*, 23 Cal.App. 251, 257 [137 P. 1072]; *Emeric* v. *Alvarado*, 64 Cal. 529, 577-80 [2 P. 418]; *Jackson* v. *Torrence*, 83 Cal. 521, 538 [23 P. 695]; *Barber* v. *Burrows*, 51 Cal. 404, 406; *Northam* v. *Gordon*, 46 Cal. 582, 587-9; *Fuller* v. *Reed*, 38 Cal. 99, 107-8; *Tewksbury* v. *O'Connell*, 21 Cal. 60, 68-9.) *Spinney* v. *Downing*, 108 Cal. 666 [41 P. 797], says (p. 668):

"It is a general rule to which this case presents no exception that, when it is a part of the understanding between the parties that the terms of their contract are to be reduced to writing and signed by the parties, the assent to its terms must be evidenced in the manner agreed upon or it does not become a binding or completed contract. This is essentially true when, as here, the proposed contract contains reciprocal stipulations and covenants upon the part of each as a consideration for the acts of the other."

The foregoing was quoted in the recent case of *Kessinger* v. *Organic Fertilizers, Inc.*, 151 Cal.App.2d 741, 749 [312 P.2d 345].

Williston says and quotes from *Sparks* v. *Mauk*, 170 Cal. 122 [148 P. 926], thus:

"It may also be supposed that the written contract was made and was signed by but one party, although a signing by both parties was contemplated. 'It is the undoubted rule

that where the contract contemplates the execution of it by signing, either party has the right to insist upon the condition, and mere acts of performance upon the part of one who has not signed will not validate the contract.' " (1 Williston on Contracts, 67, § 28A.)

Furthermore a contract in writing signed by the parties takes effect only on delivery. (Civ. Code, §§ 1054, 1626; *LaMar* v. *LaMar*, 30 Cal.2d 898, 904 [186 P.2d 678]; *Helperin* v. *Guzzardi*, 108 Cal.App.2d 125, 128 [238 P.2d 141].)

Section 1933 of the Code of Civil Procedure reads:

"The execution of an instrument is the subscribing and delivering it, with or without affixing a seal."

*In re Quartz Crystal Products Co.*, 71 F. Supp. 949, says that (p. 951): "The Courts of California and the Circuit Court of Appeals for the Ninth Circuit have held that this section means exactly what it says, i.e., its means *subscribing not by one party, but by all the parties who are required to sign it and delivering it to the party for whose benefit it is made, or delivering it for record so as to make it notice to the world.*" This decision was affirmed by the Ninth Circuit Court of Appeals in 166 F.2d 1023.

The oral agreement as found by the court took effect at once on July 29, 1954. It is manifest from the evidence that both parties understood that the proposed contract would not be effective until signed by both parties, else why would Grand Central draft it with a number of duplicate copies, and why would Grand Central sign, and why was space provided for American to do the same thing, and why did Carpenter ask Frankel to have it signed by American and returned to Grand Central? The formal provisions of the proposed contract indicate that it was to be fully executed by both parties signing.[1]

As soon as the oral agreement was made both parties acted under it and received the benefits from it. The parties clearly understood that definite terms had been agreed on. On July 30, 1954, Carpenter wrote Strube that "This will

---

[1]The testimonium clause of the proposed contract reads:

"IN WITNESS WHEREOF, the parties hereto have executed this contract as of the day and year first above written.

| "WITNESS: | GRAND CENTRAL AIRCRAFT CO. |
|---|---|
| Mary E. Kemme /s/ | S. Carpenter /s/ |
| | S. Carpenter, Secretary-Treasurer |
| "WITNESS: | AMERICAN AERONAUTICS CORPORATION |
| | " |

confirm our agreement for the work which you anticipate''
on the fighter and trainer. On July 30 Grand Central sent
an invoice for $4,000 to American reading, ''Advance Pay-
ment as per agreement with Mr. Carpenter on overhauling of
two (2) F-51B Aircraft (this payment due Monday, August
2, 1954).'' The agreement referred to was the oral agreement.
On July 31 American delivered parts to Grand Central.
Grand Central's records in evidence show the continuous per-
formance of labor beginning August 2. Similar invoices to
that of July 30 with the same wording except for different
dates of payment were sent on August 6, 13, 20, 27, September
10, and 17. Pursuant to these invoices American made pay-
ments of $4,000 to Grand Central on August 2, 9, 18, and 30,
and the latter accepted and applied them on account of labor
and materials on the fighter and trainer. On August 16
Grand Central reported to American the number of man-
hours expended on the project through August 13; on August
20, the number through August 8; on August 24, the number
through August 22. Fifteen work authorizations were signed
by American and accepted by Grand Central on August 2,
seventeen on August 3, two on August 4, 12, and 23, and one
each on August 13, 17, 19, and 30. Overtime authorizations
were given on August 7, 9, 14, and 21. On September 1
Grand Central wrote American that it was scheduling delivery
of the fighter on September 17 ''as per our original commit-
ment,'' and rescheduling delivery of the trainer on October
8, all contingent on its receiving the balance of the parts and
materials. Thus it appears that the major part of the labor
and materials was authorized, accepted, and done long before
the proposed written contract was even prepared by Carpen-
ter—it was not ready until August 30. There is no evidence
that Grand Central performed the work or furnished the
materials in reliance on American's promise to sign the pro-
posed written contract, and the court did not so find. The
parties acted strictly under the oral agreement.

■ Applying the rules stated to the facts, it is immediately
apparent that insofar as the proposed written contract is
concerned two of the necessary elements of a valid contract are
lacking. There was no mutual assent and there was no deliv-
ery. It was part of the understanding of the parties that
their oral agreement should be reduced to writing, signed by
them, and delivered. The oral agreement, as made, was not
reduced to writing. New terms were added in the writing, and
it was never signed by American or delivered. The result was

that the oral agreement remained binding (*Johnston* v. *20th Century-Fox Film Corp.*, 82 Cal.App.2d 796, 820 [187 P.2d 474]; *Columbia Pictures Corp.* v. *DeToth*, 87 Cal.App.2d 620, 629 [197 P.2d 580]), and the proposed written contract was of no force or effect. This is not a case in which it can be said the parties acted on the unexecuted written contract, or in which there was part performance of an unexecuted written contract. (See *Sparks* v. *Mauk*, 170 Cal. 122 [148 P. 926].) It follows that the finding the parties set forth the complete terms of their agreement in the proposed written contract prepared by Carpenter is not supported by the evidence.

In the absence of a statute authorizing attorneys' fees as an element of damages, or of a contract to pay such fees in event of the party's recovery, attorneys' fees paid by a successful party in an action are never recoverable against the unsuccessful party. (Code Civ. Proc., § 1021; *Williams* v. *Krumsiek*, 102 Cal.App.2d 541, 545 [227 P.2d 889].) The award of attorneys' fees to Grand Central cannot be sustained.

The complaint was filed October 5, 1954. The trial began June 6, 1955. On the third day of the trial American sought leave to file a supplemental complaint. The request was denied. American urges error. There was no error. The request was not timely. Eight months had elapsed and numerous depositions had been taken between the filing of the original complaint and the trial. No excuse was offered for the delay. A motion to file a supplemental complaint is addressed to the discretion of the trial court and its ruling will not be disturbed in the absence of a showing of a manifest abuse of that discretion. No such showing is made.

During consideration of the request to file the supplemental complaint, Grand Central orally demurred generally to the second count of the original complaint. After argument the court at first announced it sustained the demurrer. Appellant asserts error. If the ruling had stood, it would have been error. Later the same day the court ruled that parts of the second count stated facts sufficient to constitute a cause of action for damages sustained prior to or incident to the delivery of the fighter. Thus the demurrer was in fact overruled except only as it related to allegations respecting threats by Bolivia to cancel its contract with American because of delay in delivery of the fighter. This ruling obviously was error. There is no such procedure as sustaining a general demurrer to part of a count which states facts suffi-

cient to constitute a cause of action. The proper procedure is to strike any irrelevant matter. (*Continental etc. Assn.* v. *Boggess,* 145 Cal. 30, 34 [78 P. 245].) However, in view of the fact the court found Grand Central did not breach its agreement with respect to delivery and did not unlawfully detain the fighter, which findings are supported by the evidence, American was not prejudiced by the ruling.

In action 634602 American claims certain other findings are not supported by the evidence.[2] The claim is without merit. There is no point in reviewing in detail the evidence to be found in the 3,250 pages of the reporter's transcript and 127 exhibits. Suffice it to say the evidence we have related and much other in the record supports these findings.

 Lastly, American complains of the provision of the judgment reading: "That defendant has the right to retain said sum of $38,500.00 in lieu of said fighter aircraft, together with that certain partially completed F-51 D dual trainer aircraft now in the possession of defendant and those certain supporting spare F-51 D aircraft parts now in the possession of defendant until defendant receives payment in full of the total sum of $32,108.95. . . ." We find nothing prejudicially erroneous in the form of the judgment in this respect. The judgment in favor of Grand Central is for $32,108.95 and interest—no more—on account of American's breach of the agreement with respect to the fighter and the trainer. It does not give Grand Central an unqualified right to the $38,500. The provision for recovery of $38,500 as a lien in lieu of the fighter is entirely proper. (See Code Civ. Proc., § 667.) The judgment expressly provides that after satisfying the obligation which the lien secures, the excess, if any remains, is to be returned to the party entitled thereto. Grand Central's

---

[2]The findings challenged are:

". . . that the work on the fighter model would be completed within a reasonable time of approximately 35 working days and that the dual trainer model would be completed as soon thereafter as possible."

"As to said fighter aircraft (No. 44-84810) defendant has duly and fully performed all of the conditions and obligations of said agreement and of said written authorizations."

". . . and but for the further fact that on or about September 29, 1954, plaintiff demanded that defendant cease any further work under said agreement, although defendant was at such time and at all other times acting in full compliance with said agreement."

"It is not true that plaintiff suffered damage in the sum of $35,000.00, or $250,000.00, [the amount covered by plaintiff's second cause of action No. 634602] or any other sum, by reason of the refusal of defendant to deliver possession of said fighter aircraft to plaintiff."

right to interest on the award of $32,108.95 and its rights under the claim and delivery bond given by American when it secured possession of the fighter are thus protected.

### Action 637534

Grand Central sued American for money alleged to be due for labor performed and materials furnished in modification and repair of a DC-3 aircraft. American answered and cross-complained, admitting authorization of the work, and alleging that as a result of the improper and unworkmanlike manner in which the work was performed it became necessary to replace one engine and repair the other, to American's damage. Grand Central denied the allegations of the cross-complaint.

On the close of American's case on its cross-complaint Grand Central made a motion for a judgment of nonsuit. The court stated the motion was granted in part and denied in part, but that if it did not have the power to follow that procedure it was not going to require Grand Central to put on proof with respect to certain matters alleged in the cross-complaint.

After completion of work on the DC-3 Grand Central delivered it to American. Shortly after American took possession, Cerruto flew it and had to make an emergency landing in Palmdale because the right engine had failed. An expert in American's employ went to Palmdale and inspected the right engine. He testified that in his opinion the engine failed as a result of a hydraulic lock; that a hydraulic lock is caused as a result of an engine's being permitted to remain idle for several weeks or a month without proper maintenance and then is improperly started; that he based his opinion on the fact that the rod in cylinder 8 was broken. The engine had to be replaced. Cerruto testified that in flying the DC-3 to Bolivia the left engine failed over Peru; that the engine had endured about 35 hours of flight after its delivery to American. The failure was in cylinder 8.

The court granted the motion for judgment of nonsuit as to the allegations of the cross-complaint with respect to the left engine which failed on the flight to Bolivia and denied it as to the allegations with respect to the right engine. American asserts it was error to grant the motion in part. Manifestly it was error. The second count of the cross-complaint stated a single cause of action for failure to properly maintain the DC-3. A judgment of nonsuit may not be granted as to particular issues. (*Fox* v. *Hall,* 164 Cal. 287, 290 [128

P. 749] ; *Meier* v. *Golden Auto Tour Corp.*, 50 Cal.App. 277, 281 [195 P. 290] ; 2 Witkin, California Procedure, 1856, § 123. (*Cf. Estate of Jamison*, 41 Cal.2d 1, 6 [256 P.2d 984].)

It is apparent from the record that when American rested on its cross-complaint the court felt that as to the left engine there was not sufficient evidence to require Grand Central to go forward with its defense.[3] The court in effect told Grand Central it was not required to defend as against American's claim with respect to the left engine and that at the conclusion of the trial it would find for Grand Central on that issue. ▮▮▮ Thereafter, much evidence was received with respect to the maintenance performed by Grand Central on the left engine. At the conclusion of the trial the court weighed the evidence with respect to the left engine and made specific findings in favor of Grand Central with respect thereto. American was not prejudiced by the error of the court in granting the motion for judgment of nonsuit in part.

The judgment is modified by striking therefrom the paragraph which awards Grand Central attorneys' fees reading: "That defendant have further judgment against plaintiff in the sum of $7500.00, together with interest thereon at the rate of 7% per annum from the date hereof until paid." As thus modified, it is affirmed. American shall pay six-sevenths of the costs on appeal; Grand Central shall pay one-seventh.

Shinn, P. J., and Wood (Parker), J., concurred.

---

[3]The court said: "Although both engines are involved, and properly so, in the first alleged cause of action, consequently I am not too sure about the court's power in nonsuit to deny a nonsuit in part. I think that that is a proper disposition of the case. Consequently, as to the claim on the Palmdale engine, the motion for nonsuit is denied. The defendant will go to his proof on that matter. On the left engine, which was the Peru engine, the engine which failed on the flight from Lima to La Paz, the motion is granted.

"Assuming I have no power to thus grant in part and deny in part, and in order to protect the record, and in the event that my ruling might therefore here be considered erroneous, I am not going to require the defendant to put on any proof with respect to the failure of the left engine, which is the one that failed over Peru."